**TITLE GUARANTY & SURETY CO. et al.
v. STATE OF MISSOURI ex rel. and to
Use of STORMFELTZ.**

No. 11213.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1939.

Wendell H. Cloud, of Kansas City, Mo. (Harry A. Morris, of Kansas City, Mo., on the brief), for appellant Title Guaranty & Surety Co.

R. L. Douglas, of St. Joseph, Mo., and Floyd E. Jacobs, of Kansas City, Mo. (Charles M. Howell, of Kansas City, Mo., on the brief), for appellant American Surety Co. of New York.

E. H. Gamble, S. M. Mandell, and S. L. Trusty, all of Kansas City, Mo. (N. R. Fischer, B. C. Hyde, Jr., and Edward E. Pugh, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This action at law was brought on March 21, 1931, in the Circuit Court of Greene County, Missouri, at the relation of Andrew Jean Stormfeltz, a citizen and resident of Kansas City, Missouri, against Title Guaranty and Surety Company, incorporated in Pennsylvania, and American Surety Company, incorporated in New York. The purpose of the suit is to recover amounts claimed to be due to relator from his guardian, and the action is brought upon the two hundred and fifty thousand dollar bond which was executed on November 7, 1911, by the guardian, Luther J. Stormfeltz, who is the father of relator, as principal, and by the defendant Title Guaranty & Surety Company (whose liability was later assumed by defendant American Surety Company) as surety. The bond was conditioned as required by statute for the faithful discharge of his duties by the guardian and was approved by the judge of the probate court of Mercer County, Missouri, at Princeton, where the appointment of the guardian was made.

The case was removed to the federal court and the guardian, a citizen and resident of Kansas, was added as a party defendant. It appeared on the face of the petition as amended that the minority of the relator terminated and he became of age March 1, 1925, and on March 28th of that year the guardian filed in the probate court his purported final settlement, consisting of a report of debits and credits in his account in which he accounted to relator for the sum of $145,235.56, and that a recital was endorsed on the report over the signature of the judge of the probate court that the judge examined, approved and filed it on the same day, and that it was recorded in a settlement Record Book 7, at page 369. But it was alleged in the petition that the purported judgment of final settlement was null and void because statutory prerequisites to jurisdiction had not been complied with and by reason of certain extrinsic facts of fraud fully set forth in the petition. The petition contained sixty-eight separate counts, in each of which a breach of the bond was asserted and a cause of action was predicated thereon against defendants. It was prayed that the probate order of March 28, 1925, "in so far as it purports to be judgment of final settlement and discharge of said guardian, be adjudged void and held for naught", and in each count that the plaintiff recover a certain sum with interest.

The sufficiency of the plaintiff's pleading was challenged by demurrers which were sustained by the trial court, but on appeal this court decided that a case at law was stated in the pleading and we remanded for trial. State of Missouri ex rel. Stormfeltz v. Title Guaranty & Surety Co., 8 Cir., 72 F.2d 595, certiorari denied, 294 U.S. 708, 55 S.Ct. 404, 79 L.Ed.

1242. On the trial a jury was waived, twenty-eight counts were voluntarily dismissed and the court rendered judgment against the defendants upon forty of the counts and a count added by amendment, in the aggregate amount of $435,083.25, limiting execution against the bondsmen to $397,676.51. On the seventh count the judgment was for defendants. The guardian having declined to appeal, the sureties obtained severance and have prosecuted this appeal to reverse the judgment against them.

### The Jurisdiction of the Court.

At the threshold of this appeal the appellants again take the position, as they did on the former appeal, that the state court from which the case was removed to the federal court did not have jurisdiction of the action because jurisdiction in such cases was vested exclusively in the probate court by Missouri statutes. Our decision then was that the Missouri courts had consistently held that an action on a guardian's bond could be maintained against the surety before any indebtedness had been previously established or any judgment of final settlement obtained in the probate court, and we sustained the jurisdiction of the district court to try the case presented by the petition. The point now argued is that we failed to take account of the "Discovery" provisions of the Missouri statutes which empower the probate courts to proceed against persons within their respective counties who may be suspected of having concealed or embezzled money, goods or effects of a ward. It is contended that those sections of the statute as construed by the courts of Missouri operated to divest the state circuit court and therefore the federal district court of jurisdiction in this case.[1] The

---

[1] "§ 63. If the executor or administrator, or other person interested in any estate, file an affidavit in the proper court, stating that the affiant has good cause to believe and does believe that any person has concealed or embezzled, or is otherwise wrongfully withholding any goods, chattels, money, books, papers or evidences of debt of the deceased, and has them in his possession or under his control, the court may cite such person to appear before it, and compel such appearance by attachment." Revised Statutes, 1929, Sec. 63, Mo.St.Ann. § 63, p. 38.

"§ 64. If the party so cited does not admit the allegations in the affidavit, he shall be examined under oath, after which, at the instance of the administrator or executor, other witnesses may be examined both for and against such party; but before such other witnesses shall be examined, interrogatories shall be filed in writing, to be answered also in writing by the parties cited." Revised Statutes, 1929, Sec. 64, Mo.St.Ann. § 64, p. 41.

"§ 65. If such person refuse to answer proper interrogatories, the court may commit him to jail until he answer or be discharged in due course of law." Revised Statutes, 1929, Sec. 65, Mo.St.Ann. § 65, p. 42.

"§ 66. The issue upon the interrogatories and answers thereto shall be tried by a jury, or if neither of the parties require a jury, by the court, in a summary manner, and judgment shall be rendered according to the finding and for costs, and if convicted, the court shall compel the delivery of the property detained by attachment of his person for contempt, and the court shall commit him to jail until he comply with the order of the court." Revised Statutes, 1929, Sec. 66, Mo.St.Ann. § 66, p. 42.

"§ 67. Like proceedings may be instituted on the affidavit of any person interested against executors, administrators or surviving partners, and on conviction, the court shall compel such executor, administrator or surviving partner to inventory the property and cause the same to be appraised as the property of the estate; except that further proceedings, after the examination of the party cited, shall not depend upon the desire of the executor, administrator or surviving partner, as provided in section 64, but may be ordered by the court." Revised Statutes, 1929, Sec. 67, Mo.St.Ann. § 67, p. 43.

"§ 400. Upon complaint made, on oath, to any court having jurisdiction, by any guardian, curator or ward, or by any creditor or other person interested in expectancy, reversion or otherwise, against any person within the county suspected of having concealed or embezzled any of the money, goods or effects of the ward, and has them in his possession or under his control, the court may cite and examine such suspected person, and proceed as to such charge in the same manner as is provided by law respecting persons suspected of concealing or embezzling the effects of a testator or intestate." Revised Statutes, 1929, Sec. 400; Revised Statutes, 1879, Sec. 2584, Mo.St.Ann. § 400, p. 255.

"§ 401. If any person file a like complaint against any guardian or curator, the probate court shall have the same power to cite [him] and compel his appearance, and shall proceed upon such

cases cited by appellants in support of this point are appended.[2] On the other hand the appellee contends that the discovery proceedings under the probate code are intended to bring wrongfully withheld assets of an estate that is in process of administration, whether of a decedent or of a minor ward, into probate court for that purpose, and that in the present case where no claims of third persons are involved, no discovery proceedings in the probate court were necessary, but the proper action was the suit brought upon the bond in the circuit court.

We are not persuaded that the Missouri cases relied on by appellants hold either directly or by implication that the cited discovery statutes divest the circuit court of jurisdiction over such a suit on guardian's bond as is here presented. On the contrary, the case of Smith v. St. Louis Trust Company, 340 Mo. 979, 104 S.W.2d 341, decided since our former opinion, confirms our conclusion that the law of the case established in that opinion ought not to be departed from on this appeal. It is true that in the Smith case the plaintiff sued upon an administrator's bond and here the bond in suit is that of guardian. But the right to sue on one or the other is substantially similar. Mo.Rev.St. 1929, Sec. 396, Mo.St.Ann. § 396, p. 253.

The jurisdiction is also attacked by appellants on the ground that the form which the action took upon the pleadings and evidence required the court to pass upon adverse claims of title to lands in Iowa, and also to determine that defendants were liable for maladministration of assets of the ward in Iowa. It is argued that in reaching its judgment, the trial court exceeded its jurisdiction in those respects. The questions as raised will be referred to later, but we are convinced that the suit remained throughout an action on the guardian's bond for money due on account of breaches of the bond by the guardian, and that the district court

had jurisdiction to try it and to render such judgment as the facts warranted. Garton v. Botts, 73 Mo. 274; Scruggs v. Scruggs, C.C., 105 F. 28-30.

Another attack closely related to the question of jurisdiction is directed to the refusal of the court to receive the testimony of the guardian to the effect that the plaintiff had waived the notice of final settlement required by statute and had ratified the judgment of final settlement entered in the probate court at the time he attained his majority. The question of the validity of the probate court judgment of settlement was necessarily involved in the first appeal of this case to the extent that the jurisdictional defects relied on were correctly alleged in the petition. By our decision we found the allegations sufficient to show want of jurisdiction in the probate court to adjudicate final settlement of the guardian's account. The evidence on the trial sustained the allegations in the petition as to the failure to comply with the statutory requirements prerequisite to adjudication of final settlement of guardians' accounts, but defendants offered to prove by testimony of the guardian that the ward had been informed in conversations had between them that the settlement was to be made on the date that it was entered and had been given a copy of the settlement, and that the ward was present in the court at the time of the adjudication, and that the ward assented to the settlement and the judgment.

It is contended for the ward that the oral testimony was incompetent to establish jurisdiction in the probate court over the ward for the purpose of adjudicating upon the accounting with his guardian, and we think the district court's rulings in his favor were proper. The record of the probate court and its judgment roll were the best evidence, and as that record disclosed that *no jurisdiction over the ward had been obtained and that no appearance had been made on his behalf*, the

---

complaint in the same manner as is provided by law against executors and administrators in such cases." Revised Statutes, 1929, Sec. 401; Revised Statutes, 1879, Sec. 2885, Mo.St.Ann. § 401, p. 255.

[2] In re Clinton's Estate, 223 Mo. 371, 123 S.W. 1; Trautmann v. Trautmann, 300 Mo. 314, 254 S.W. 286, 287; In re Estate of Huffman, 132 Mo.App. 44, 111

S.W. 848; Kadlowski v. Schwan, 329 Mo. 446, 44 S.W.2d 639; State ex rel. Nute v. Bruce, 334 Mo. 1107, 70 S.W.2d 854; Phillips v. Alford, Mo.App., 90 S.W.2d 1060; Nebel v. Bockhorst, 186 Mo.App. 499, 172 S.W. 452; State ex rel. Lamm v. Lamm, Mo.App., 216 S.W. 332; State Bank v. Lillibridge, 316 Mo. 968, 293 S.W. 116; Davis v. Johnson, 332 Mo. 417, 58 S.W.2d 746; Hax v. O'Donnell, Mo.App., 117 S.W.2d 667.

oral testimony was incompetent. Appellants urge that the decision of the Kansas City Court of Appeals in Anderson v. Middle States Utilities Company, 231 Mo.App. 129, 98 S.W.2d 163, compels a different conclusion. We do not so understand the decision. It was there held that a minor could on coming of age ratify voidable contracts made without his authority during his minority, but it was neither involved nor ruled that where a guardian has obtained a judgment of final settlement against his ward which is void for want of jurisdiction over the ward, the guardian may establish the validity of the judgment by his oral testimony of conversations had with the ward concerning the judgment.

### Counts I and III.

The trial court found the facts upon the issues presented by the first and third counts of the petition as follows:

"Findings of Fact.
"As to Counts I and III.

"Relator, Andrew Jean Stormfeltz, was born Feb. 29, 1904. He is the son of Luther J. and Lulu Stormfeltz, husband and wife. She was a daughter of T. W. Ballew. She died at the time of relator's birth. He is the only child of Mr. and Mrs. Stormfeltz.

"Thomas W. Ballew died, intestate, on Sept. 11, 1911, a citizen and resident of Princeton, Mercer County, Missouri. His principal business was and for many years had been the merchandising of lumber and building materials through a chain of lumber yards in northern Missouri and southern Iowa. Up to Feb. 15, 1908, he operated these yards under the name of Ballew Lumber Company as a trade name. On Feb. 15, 1908, he executed a bill of sale whereby he conveyed the yards thus operated to a Missouri corporation which he had formed on or about that date, under the corporate name of Ballew Lumber Company. The capital stock of the corporation was divided into 10,000 shares.

"At the time of Ballew's death, he owned all the stock of the Ballew Lumber Company, although a qualifying share of the stock was outstanding in the name of each of the four persons who, together with himself, constituted the five members of its board of directors. At that time the Ballew Lumber Company owned retail lumber yards at the following places:

| | |
|---|---|
| Princeton, Mo. | Maitland, Mo. |
| Trenton, Mo. | Spickard, Mo. |
| Gallatin, Mo. | Marshall, Mo. |
| Jamesport, Mo. | Leon, Iowa. |
| Plattsburg, Mo. | Seymour, Iowa. |
| Mound City, Mo. | Bloomfield, Iowa. |

"Mr. Ballew also owned a series of lumber yards, or controlling interests therein, which were called 'blind' yards. These blind yards were not operated in his name, or in the name of his corporation, and were not corporate assets. They were the property of T. W. Ballew as an individual. Among these blind yards were the following: One at Brimson, Missouri, operated in the name of Brimson Lumber Company. Two yards operated under the name of Hubacher Lumber Company, one at Leon, Iowa, and the other at Mound City, Missouri. Another was at Seymour, Iowa, operated under the name of H. S. Eckels Lumber Company.

"The reason the foregoing were called 'blind' yards is that Mr. Ballew kept the fact that he was interested therein secret from the public. At each of the points where they were operated, except Brimson, where a blind yard was operated, there was another yard of the Ballew Lumber Company. Ballew's purpose in having blind yards at these points was to bluff out competitors by creating an appearance of the field being fully occupied with competitive yards. The apparent reason for operating the Brimson as a blind yard was to protect from competition at that point the yards of the Ballew Lumber Company at Trenton, Jamesport and Gallatin, Missouri, and the yards at Trenton and Gallatin, owned by Miner & Frees, who also owned an interest in the Brimson yard.

"Mr. C. A. Hubacher, who lived in St. Joseph, Missouri, and whose name was used in the operation of the Leon and Mound City blind yards, had no financial investment therein. Ballew owned those yards in their entirety, and merely used the name of Hubacher in their operation. Mr. Hubacher visited the yards occasionally, for the purpose of keeping up the appearance of ownership, though he in reality had no such interest. The evidence does not show any other activity of Hubacher in connection with the Leon and Mound City yards except as hereinafter stated. He died during the latter part of the year 1913, long before the commencement of

this action; hence his testimony is not produced.

"The Leon yard was acquired by Ballew and placed in the name of Hubacher Lumber Company during the early part of 1903. At that time D. D. Waldeck was purchasing agent for Ballew, stationed at Plattsburg, Missouri, and also was manager of two of Ballew's lumber yards, one of which was at Plattsburg, and the other at Smithville. P. E. Brady was working at the Plattsburg yard for Mr. Ballew under Mr. Waldeck. Ballew asked Waldeck to recommend some young man for a lumber yard operator, and Waldeck recommended Brady, who went from Plattsburg to Leon as local manager of the blind yard there under Hubacher's name. Mr. Brady held that position to the time of Ballew's death, and thereafter until on or about July 2, 1912.

"The blind yard at Seymour was operated under the name of 'H. S. Eckels Lumber Company'. Mr. Eckels lived in Seymour. He and Ballew bought the yard on or about Feb. 12, 1907, to protect from competition the Ballew Lumber Company's yard there. The purchase price was $14,500.00. Of this, Ballew advanced $12,500.00, and Eckels $2,000.00. To evidence the interest of Ballew in this yard, Eckels executed a note payable to Ballew for $12,500.00, dated Feb. 12, 1907. Shortly afterward, Ballew advanced an additional $1,000.00 as working capital for the yard. To evidence this, Mr. Eckels executed another note, dated May 1, 1907, payable to a bank at Princeton then owned by Mr. Ballew, called the Ballew Bank. These notes never were endorsed, sold or transferred. Mr. Ballew owned them, and kept them among his papers, and at his death they passed into the hands of his administrators and became a part of his estate.

"Ballew owned the above mentioned blind yards and interests therein at the time of his death, except that a short time previously he had sold the Mound City blind yard. After such sale, Mr. Hubacher, in whose name it had been operated, engaged in collecting its accounts with customers, and remitting such collections to Mr. Ballew. Hubacher was so doing at the time of Ballew's death. He continued as such collecting agent for Ballew's administrators until the close of the administration, May 17, 1913. After the close of the administration of the Ballew estate, he continued in the service of the heirs as such collector until the time of his death a few months later.

"Ballew left surviving him as his sole and only heirs at law his widow, Charity Ballew, and his two daughters, Mrs. Jessie B. Hyde and Winifred Harrison, and his grandson, Andrew Jean Stormfeltz, the relator. Each of said heirs inherited an undivided one-fourth interest in Mr. Ballew's estate.

"Sept. 28, 1911, the administration of the estate of Thomas W. Ballew was commenced in the probate court of Mercer County, Missouri, at Princeton, which court appointed Ben C. Hyde, husband of Jessie B. Hyde, and Luther J. Stormfeltz as administrators thereof. They were placed upon a salary, paid by the estate, of $250.00 per month to Mr. Hyde and $100.00 per month to Mr. Stormfeltz. Mr. Hyde lived in Kansas City, Missouri, where the administrators maintained an office, first in the Reliance Building, and then in the Waldheim Building, in conjunction with the Kansas City office of the Ballew Lumber Company. It was in this office that most of the business of the estate was transacted and conducted.

"Stormfeltz had little to do with the administration. By common consent, Mr. Hyde, who was a highly capable business man in whom all the heirs and Stormfeltz placed implicit confidence, took active charge of the estate. He kept its books and accounts and conducted its affairs to the close of the administration on May 17, 1913. On that date, the administrators filed their final account. On the same day that the final account was filed, the probate court approved it and discharged the administrators.

"The estate of Ballew was inventoried and appraised at $706,850.84. This inventory and appraisal included the capital stock of the Ballew Lumber Company and much other property of Mr. Ballew, but did not include the whole of his estate. It entirely omitted the blind lumber yards, and also omitted the two above mentioned Eckels notes of $12,500.00 and $1,000.00. Also, other assets of the estate of large value were omitted from the inventory. None of the property or funds so omitted from the inventory was administered. It was all distributed as unadministered as-

sets among the heirs by mutual consent of themselves and Stormfeltz, as guardian of relator.

"The amount and character of the unadministered assets of the estate is only partially shown by the evidence. A full disclosure thereof is not necessary for the purposes of this action. The amount of all disbursements of the assets and funds derived from the sale of the assets, both administered and unadministered, not only during but also after the close of the administration, is fully shown.

"The reason for the omission of certain assets of Ballew from the administration of his estate was that the heirs and Stormfeltz were in entire agreement among themselves at all times with respect thereto, and considered that no administration thereof was necessary or advantageous. Also, they considered that if the blind yards were inventoried the secrecy which Mr. Ballew always had maintained with respect to his interest therein or ownership thereof would be dispelled and the fact of such ownership become known to competitors and the trade. The heirs and Stormfeltz desired to continue such secrecy as a family tradition and also for what they regarded as the benefit of the yards owned by the Ballew Lumber Company.

"The indebtedness of the Ballew estate, compared to its entire value, was small and insignificant. During the administration the administrators paid it in full out of the administered assets. This left no one but the heirs and Stormfeltz who could have complained of the fact that a substantial portion of the assets were omitted from the administration.

"Neither the heirs nor Stormfeltz made such complaint. On the contrary they approved of and aided and encouraged the omission. By their mutual consent and agreement the unadministered assets were divided among and distributed to themselves, through the administrators acting as their trustees. For these distributions of unadministered assets the heirs and Stormfeltz as guardian for relator, executed receipts to the administrators, discharging them from all liability on account of such distributions. The distributions of unadministered assets and the receipts therefor, never were reported to or filed in the probate court. Its record is silent with respect thereto.

"Luther J. Stormfeltz married Lulu Ballew, daughter of T. W. Ballew, sometime during the year 1902. At that time he was a blacksmith or blacksmith's helper or apprentice. After the marriage he quit blacksmithing and attended a business college at Quincy, Illinois. His expenses there were paid by Mr. Ballew. He then returned to Princeton, Missouri, and entered the service of Mr. Ballew. He worked in Ballew's lumber business on a salary from that time forward to the date of Ballew's death. In that capacity his duties included the taking of annual inventories of the various lumber yards of Mr. Ballew and of the Ballew Lumber Company, and the making of annual financial statements or 'recaps' of the yards.

"His son, Andrew Jean Stormfeltz, lived in Princeton with his grandparents, Mr. and Mrs. Ballew, from the time of his birth to and including the date of Mr. Ballew's death. He was then a minor, aged seven and one-half years.

"Nov. 8, 1911, Luther J. Stormfeltz, who was then a resident of Mercer County, Missouri, at Princeton, was by the probate court of that county appointed guardian and curator of the person and property of his son, Andrew Jean Stormfeltz, and required to give a guardian's bond in the sum of $250,000.00. He gave such bond with the defendant, Title Guaranty and Surety Company as his surety thereon. In the application which he made for said bond, Stormfeltz states that his financial worth is $7,000.00.

"Nov. 23, 1911, the first distribution of the assets of the Ballew estate was made. It consisted of the stock of the Ballew Lumber Company, appraised in the Ballew estate at $50.00 per share. Of this stock 2,499 shares were allotted to each of the heirs. Each heir and Stormfeltz as guardian furnished a refunding bond of $125,000.00.

"Dec. 15, 1911, or about that date, H. S. Eckels had on hand $9,200.00 that belonged to the Ballew estate. Of this sum, $8,000.00 was for money which Ballew, in June, 1911, had advanced to Eckels to pay for a lumber yard which Ballew, through and in the name of Eckels, had bought in Seymour, known as the 'Johnson' yard. The object of the purchase of the Johnson yard was to eliminate it as a competitor of the Eckels yard and also the yard of the

T. W. Ballew Lumber Company (operated through Mr. Shanafelt as its manager) at that point.

"Eckels had disposed of the lumber and building materials and other merchandise contained in the Johnson yard, and thereby accumulated the money necessary to repay the $8,000.00 advanced by Mr. Ballew. He also was ready to pay an additional $1,200.00, on the share of T. W. Ballew in the profits of the Eckels yard for the year 1910. The amount of Ballew's share of such profits for 1910 was $2,980.00. This is shown by the testimony of Mr. Eckels and also by a balance sheet or 'recap' of the Eckels yard, dated 12/20-1910, which was made by Luther Stormfeltz as an employee of Ballew, and which is in his handwriting, being Exhibit No. 'O' of the Eckels deposition, and also introduced in evidence as PX No. 44. This recap contains, among other things, an entry in the handwriting of Stormfeltz, as follows:

"'Profit to be paid T. W. Ballew, $2,980.00'.

"Prior to the death of Ballew, Eckels had paid to him $1,280.00 of this profit, and the payment of the additional $1,200.00 above mentioned would reduce the balance due to Ballew for the 1910 profits down to the sum of $500.00.

"Mr. Eckels was imbued with the same idea of profound secrecy which possessed Ballew and his employees and heirs with respect to his ownership in the Eckels blind yard at Seymour. During all the years that Mr. Ballew and he had owned the yard, Mr. Eckels never had sent to Ballew any check or draft payable to him. This was to avoid attracting attention of outsiders through whose hands such paper would have to pass to the fact that Ballew was getting the lion's share of the profits of the yard, and thus risk betrayal of the secret of Ballew's ownership therein. Hence Eckels, in making such payments always had met Ballew or one of his employees, such as Hayes, Hollister or Stormfeltz, at Princeton or some other agreed rendezvous, and there Eckels would make the payments in cash or by other means that would not involve disclosure of Ballew's name.

"Hence when Eckels came to make the above mentioned $9,200.00 payment to Mr. Hyde as Ballew's administrator, he wanted to do it in such a way as to keep the local bank in Seymour from knowing that Eckels was paying the money to Ballew's estate, as it would know if Eckels were to purchase from it any draft payable to Ballew's administrator. Consequently, he purchased from the Seymour bank a $9,200.00 draft, made payable to a man named B. S. Parker, of Elgin, Illinois. He mailed this draft to Parker with directions that Parker should use it to purchase a Chicago draft in Elgin of the same amount, payable to Mr. Hyde, and mail this new draft to Mr. Hyde in a letter enclosed by Eckels and addressed to Hyde, at the office of the administrators in Kansas City, Missouri. Parker did as Eckels requested. Mr. Hyde received from Parker the Eckels letter and $9,200.00 Chicago draft, and so acknowledged by a letter which he wrote Eckels Dec. 28, 1912, as follows:

"'Hannibal, Mo., 12/28-11.
"'Mr. H. S. Eckels,
"'Seymour, Ia.

"'We are in receipt of yours of the 20th inst. enclosing Chicago exchange for $9,200.00 in payment of your note for $8,000.00, and $1,200.00 on last year's business. We are enclosing cancelled note herewith.

"'Yours very truly,
"'BCH/W (Signed) Ben C. Hyde.'

"Mr. Hyde did not deposit this draft in any bank account kept by the administrators in their names as such, or in any other bank account that has been introduced in evidence, and what he did with the draft is not shown by the evidence.

"Stormfeltz testifies that the $1,200.00 of 1910 Ballew profits contained in the $9,200.00 draft, was paid to him by Ben Hyde. The Ballew heirs knew nothing about any such payment and Stormfeltz's bank accounts do not show any such deposit. There is nothing in the record to corroborate his claim that any such payment by Mr. Hyde ever was made to him.

"The administrators, on Jan. 15, 1912, opened an account in the Commerce Trust Company, Kansas City, Mo. This account was called by Mr. Hyde the 'T. W. Ballew Account No. 2'. Also he called the blind yards 'T. W. Ballew lumber yards No. 2'. This account was in the name of 'Stormfeltz & Hyde'.

"There was not at any time any joint business relationship between Stormfeltz and Hyde except as administrators of the Ballew estate, and there was no occasion for them to have a joint account except for

the purpose of handling estate funds. They had two other bank accounts. Both were kept in their names as administrators. One was with the Commerce Trust Company and the other was in the Farmers Bank at Princeton. Those two accounts were kept in the name of 'Hyde and Stormfeltz, Administrators'. All funds belonging to the administered assets of the Ballew estate were handled through these two accounts.

"This Stormfeltz and Hyde account ran to June 12, 1913 when it was closed by transfer of the balance therein to a new account entitled, 'Ballew, Harrison, Stormfeltz and Hyde.' To this new account of B. H. S. & H. was also transferred the balance of funds in the hands of the administrators derived from administered Ballew assets, as shown by their final settlement in the probate court.

"That was done after the probate record relating to administered assets had been closed and the administrators were no longer required to make public reports thereto. It was then possible to keep the affairs of the Ballew estate private. By thus placing the small undistributed amount of the administered funds, previously kept in the name of 'Hyde and Stormfeltz, Administrators', and the other funds, until then kept in the name of 'Stormfeltz and Hyde' in the Commerce, the two classes of bank accounts found one common resting place by being merged into a single bank account, in the Commerce, in the above mentioned account of 'Ballew, Harrison, Stormfeltz and Hyde'.

"Through the years that followed the opening of the B. H. S. & H. account, many deposits were made therein. These included all collections of assets that had not been reduced to money at the time of the close of the administration. Also, the proceeds of the sale of the scattered Ballew real estate and many odds and ends of the Ballew assets. From the B. H. S. & H. account, various disbursements were made, including six distributions paid to the heirs. The last of these was Jan. 18, 1926, and consisted of $10,000.00, or $2,500.00 to each heir, by which the B. H. S. & H. account was balanced and permanently closed.

"Returning to the Stormfeltz and Hyde Account in the Commerce, the following is a complete copy thereof, except that the credits for interest paid on the deposits by the Commerce and credited monthly

are here grouped into a single item of $32.-35, under date of 7/1–1913.

| Stormfeltz and Hyde Commerce Trust Co. | | |
|---|---|---|
| 1912 | Deposits | Checks |
| 1/15 | 719.47 | |
| 1/23 | 1,057.68 | |
| 1/24 | 500.00 | |
| 3/15 | 480.87 | |
| 5/14 | 58.35 | |
| 7/6 | 6,500.00 | |
| 7/6 | | 9,095.73 |
| 1913 | | |
| 1/24 | 5,538.83 | |
| 1/27 | | 1,393.65 |
| 1/28 | 89.32 | |
| 1/28 | | 300.00 |
| 2/11 | | 1,393.65 |
| 2/11 | | 1,393.65 |
| 2/11 | | 1,393.65 |
| 5/12 | 149.75 | |
| 7/1 Int. on Dep. | 32.35 | |
| 6/12 | | 6.49 |
| 6/12 To a/c Ballew, Harrison, Stormfeltz & Hyde | | 149.80 |
| | $15,126.62 | $15,126.62 |

"The precise source of the nine deposits in the Stormfeltz and Hyde account is not shown, except in two instances, namely, the deposit of $500.00 on 1/24-1912, and the one of $5,538.83 on 1/24-1913.

"The $500.00 deposit of 1/24-1912, was of money paid by H. S. Eckels. He came to Kansas City on that date, went to the office of the administrators, which then was in the Reliance Building, and there paid to the administrators or one of them, in cash, the sum of $500.00 in full of the balance due to T. W. Ballew for the 1910 profits of the Eckels yard. This was money derived from an unadministered asset, namely the Eckels blind yard at Seymour. It was on the same day then deposited in the Stormfeltz and Hyde account. As the $500.00 came from an unadministered Ballew asset, the money itself was placed in the same category, and its collection by the administrators, though fully known to the heirs, never was reported to the probate court.

"The other deposits of $5,538.83 on 1/24–1913, was money realized by the sale to Frank Harrison of the Ballew interest in the Miner & Frees blind yard at Brimson. Mr. Harrison had Stormfeltz and Hyde notify Miner & Frees by letter that Harrison had bought the Ballew interest in the Brimson yard for $5,538.83. This notice was signed by them as administrators. Following is a copy thereof.

" 'January 24, 1913.

" 'Miner & Frees,

" 'Bethany, Mo.

" 'Gentlemen:

" 'This is to inform you that on January 1, 1913, we sold our interest in the Brimson Lumber Company, amounting to $5,538.83, to Frank D. Harrison; thus transferring to Mr. Harrison all the interest of T. W. Ballew in the Brimson Lumber Company, as evidenced by a contract dated April 30, 1904, between T. W. Ballew, as first party, and Miner & Frees, as second party.

" 'Yours very truly,

" 'T. W. Ballew Estate,

" 'By (Signed) Ben C. Hyde,

" '(Signed) L. J. Stormfeltz,

" 'Administrators.'

"The $5,538.83 that was thus paid by Harrison and deposited in the S. & H. account was not reported to the probate court. With respect thereto its records are silent. This $5,538.83, like the Eckels $500.00 constituted unadministered funds of the Ballew estate.

"The fact that the $500.00 payment by Eckels on account of earnings of the blind yard at Seymour, 'and that the $5,538.83 realized by the sale of the Brimson blind yard to Harrison, were both from blind yards that were unadministered assets of the Ballew estate and that both sums were deposited in the S. & H. account, and that neither of these collections made by the administrators was reported to the probate court, are circumstances that indicate the purpose of the account.

"As to the other seven deposits in the S. & H. account, although the exact source thereof is not shown, the evidence does show that none of them came from either of the accounts of Stormfeltz and Hyde as administrators, and that they did not come from any administered assets of the Ballew estate. The fact that the deposits were made merely proves that Stormfeltz and Hyde kept unadministered cash resources of the estate somewhere not revealed by the evidence, on which they drew to supply the funds deposited in the S. & H. account.

"Mr. Hyde is physically and mentally incompetent, so that his testimony is not produced on this or any other point. The only other living person who must have known where these funds were kept is the defendant Stormfeltz. He testified at great length, first by depositions taken before the trial, and again orally at the trial. Yet he did not reveal the source of these deposits, nor [giving] any adequate reason for not so doing. Although he jointly with Mr. Hyde signed check after check against the S. & H. account, and although more than $10,000.00 of the $15,126.62 deposited in the account was paid to him, still he tells this court that he remembers nothing whatever about the account.

"The character of the account is further shown by the purpose of the checks drawn against it which were either endorsed to Stormfeltz or in which he is named as payee, and by the purpose of other checks, drawn against the account, all of which checks are hereinafter more particularly described.

"All deposits, in the Stormfeltz and Hyde account, and all withdrawals therefrom, were of unadministered Ballew assets. The sole purpose of the Stormfeltz and Hyde account was to handle funds that belonged to the unadministered assets of the Ballew estate.

"January 27, 1912, Stormfeltz as guardian, filed in the probate court an inventory of relator's estate. Therein he recites that he has received 2,499 shares of the stock of the Ballew Lumber Company for his ward. On Feb. 16, 1912, appointees of the probate court appraised this stock at $25.00 per share, or $62,475.00. These appraisers were J. E. Fuller, O. J. Somerville, and F. A. Lambert. Mr. Fuller was then and is now the president of the Farmers Bank of Princeton, and a brother-in-law of Stormfeltz, whose sister he married. Mr. Somerville was a Ballew employee, and a close friend of Stormfeltz. Mr. Lambert was clerk of the probate court.

"The Missouri statute, R.S.1929, Sec. 399, Mo.St.Ann. § 399, p. 255, provides that when a guardian receives any personal estate from an administrator that already has been appraised, a second appraisal thereof by the guardian is dispensed with, and the statute requires him to state in his inventory the original appraisement and provides that he shall be held to account accordingly. In this instance, Stormfeltz, in his inventory, was silent as to the fact that the administrators had appraised the stock at $50.00 per share, or $124,950.00. The second appraisal was not only superfluous, but was incorrect. It was below the true value of the stock, which was worth much more than the $62,475.00 thereby shown.

"March 16, 1912, distribution No. 2 of the Ballew estate was made. It consisted of money and personal property, valued in all at $160,000.00, which the administrators divided among and paid to the heirs. The part that went to Mrs. Hyde and Mrs. Ballew consisted of school bonds of the city of St. Joseph and other securities worth $80,000.00 or $40,000.00 to each. As to Mrs. Harrison, the consideration that moved to her was the cancellation of the unpaid balance on certain notes executed prior to the death of Mr. Ballew by herself and her husband to him, as the purchase price of the 'Monarch', a department store which Ballew had established in Princeton, Missouri, and which she and her husband purchased from him and owned and were operating it at the time of Mr. Ballew's death. The consideration that moved to Stormfeltz was cash in the sum of $40,000.00. This money he deposited to his credit in the Commerce Trust Company, kept in his name as guardian. Each of the adult heirs and Stormfeltz as guardian agreed to the above distribution and executed to the administrators a separate $40,000.00 receipt for the same.

"The $160,000.00 in money and money's worth thus distributed was from the administered assets of the Ballew estate, and was so reported by the administrators to the probate court. Also, Stormfeltz in his first annual report as guardian charged himself with the $40,000.00 thereof that was paid to him.

"April 12, 1912, Stormfeltz filed in the probate court a petition for leave to invest $40,000.00 of his ward's funds in additional Ballew Lumber Company stock. The court sustained this petition and authorized Stormfeltz to buy the additional stock 'at book value', but no such transaction ever was consummated.

"May 8, 1912, Mrs. Jessie B. Hyde sold her 2,499 shares of Ballew Lumber stock, plus one additional share that had been issued to her as a director of the lumber company, making 2,500 shares in all, to Charity Ballew and Winifred Harrison for $84,827.82. This consideration was paid in cash, school bonds and a secured note, signed by Mrs. Ballew and Mrs. Harrison, which note was paid in full.

"June 25, 1912, Stormfeltz, as guardian, filed in the probate court a statement reciting that relator's 2,499 shares of Ballew Lumber Company stock was worth $62,475.00, but was not sufficient to give him control of the investment. That he can exchange it for the merchandise and real estate of the Princeton and Jamesport yards of the Ballew Company, plus a cash difference. That he is conversant with the retail lumber business and that such trade would enable him by personal management greatly to increase the ward's income.

"Although in this petition he asked no order of any description, and does not expressly state that he intends to engage in business with his ward's funds if permitted so to do, yet that is the clear implication. The Princeton and Jamesport yards did not belong to relator's estate but belonged to the Ballew Lumber Company, of which the probate court had no jurisdiction. Nevertheless, the court, of which Hadley J. Alley was judge, proceeded as though the opposite were true. Of his own initiative, so far as shown by the record, the court appointed three Davies County appraisers to value the Jamesport yard realty, and three Mercer County appraisers to value the Princeton yard realty.

"Both sets of appraisers apparently were on hand, and ready to proceed. On the same day they were appointed, they qualified and appraised the Jamesport realty at $4,717.36, and the Princeton at $6,065.45. Those were the exact book values, as shown by the next preceding Jamesport yard recap and the Jamesport yard journal, dated 2/12–1912, and by the next preceding Princeton yard recap and Princeton yard journal dated 2/28–1912, plus a 90¢ Princeton yard item entered in said journal on May 11, 1912. This cannot be reasonably explained on the theory of coincidence, and the clear inference is that the appraisers had been furnished the book values and were waiting to adopt them as soon as they could be appointed, and had come into court to be appointed and report the book value as their own valuation.

"As to the lumber yards proper, exclusive of the real estate, no appraisal was made, and the court heard no testimony with respect thereto. This is shown by the defendant's evidence, namely, the testimony of Hadley J. Alley, whom defendants produced at the trial as their witness. He testified that he heard no evidence as to the value of the yards, and that all he had as a basis for the values at which he authorized the guardian to accept the yards was conversations he had with persons out on the street.

"Nevertheless, the court entered an order which recited that it had been made to appear by competent evidence that the 2,499 shares of relator's stock had an actual value of $62,475.00, and authorized the guardian to exchange it for the Princeton yard at $28,850.53, plus the yard real estate at $6,065.45, a total of $34,915.98, and the Jamesport yard at $16,884.66, plus the yard realty at $4,717.36, a total of $21,602.02, and $5,957.00 in cash, and that the guardian should transfer the stock to the Ballew Lumber Company or its nominee on receiving the yards and cash aforesaid.

"The fact is that the book value of the Princeton yard, including realty, was $28,941.83, and of the Jamesport yard, including realty, $15,427.89, and the valuations thereof stated in the foregoing order were inflated above book value by approximately the book value of the real estate. This fact was admitted by defendants in open court at the trial.

"The book value of the Princeton and Jamesport yards must, in the absence of any credible evidence to the contrary,· and there is none, be taken as their actual value for the purposes of this case. As to the value of the other Ballew Lumber Company yards, exclusive of the Jamesport and the Princeton, it is shown by the evidence to have exceeded the book value by about $50,000.00, and to have actually sold for that sum above such ·book value, after Stormfeltz had disposed of his ward's interest therein. As to the value of relator's stock, it was more than its book value, which was $81,343.99.

"If the foregoing order of 6/25–1912, had been carried out, the book values which Stormfeltz would have received are as follows:

| | |
|---|---|
| Princeton | $28,941.83 |
| Jamesport | 15,427.89 |
| Boot money | 5,957.00 |
| Total | $50,326.72 |

For this he would have parted with stock worth at book value $81,343.99, so that relator's estate would have lost at a minimum the difference between $50,326.72 and $81,343.99, or $31,017.27.

"The fact that the probate court had no jurisdiction of the Ballew Lumber Company prevented it from requiring the company to make the trade, and the court made no attempt to do so in the above order. Such order did not and could not amount to anything more than an authorization to Stormfeltz to make the trade therein mentioned, if the Ballew Lumber Company saw fit to enter into it with Stormfeltz.

"Stormfeltz testified that the amount of boot money that was paid to him was that which was specified in the probate order of 5/25–1912, namely $5,957.00. The bank account of the Ballew Lumber Company has been introduced in evidence. It shows two things. One is that the Ballew Company had no money to its credit at the time when Stormfeltz says it issued to him the $5,957.00 check, and that the account already was overdrawn. The other is that as the bank then kept customers' accounts it entered the name of the payee of each check that was paid. These entries do not show any such check to Stormfeltz.

"Stormfeltz further says that this payment was made to him by a check of the Ballew Lumber Company and that he deposited it in some of his bank accounts. But his bank accounts as guardian show positively that no such sum as $5,957.00 was deposited therein, and his personal bank accounts contain no deposits which, under the evidence, can be attributed to a deposit of that sum. His testimony that such payment was made to him is wholly uncorroborated, and not credible.

"No order confirming any proceedings purporting to have been made pursuant to the order of 6/25–1912, ever was asked of or made by the probate court. Neither Stormfeltz nor anyone else reported to the probate court that any such trade had occurred. No payment was made and no title passed to anyone in reliance on said order. To relator's good fortune, it never was carried out. Hence there is no occasion to set it aside, although defendant's evidence would justify this court in so doing if any necessity therefor appeared.

"Stormfeltz had no intention of exchanging the stock at less than book value for two yards at more than book value. A trade was actually in contemplation, but of very different character. 'The actual trade, and not the one authorized by the order of 6/25–1912, was made only ten days later, and the order was only one of several steps take preparatory thereto.

"The real trade had been fully discussed by Stormfeltz with Mr. Hyde, Frank Harrison and Mrs. Ballew. Also, Mr. Hyde and Mr. Harrison had talked it over with their respective wives. It was known to be agreeable to all concerned before the probate court proceedings were commenced.

512

Those proceedings had no purpose other than to obtain the court's authority to trade off relator's stock, and create a record that by its language would cause an impression on the public, without actually so stating, that Stormfeltz was trading relator's stock for the Jamesport and Princeton yards and $5,957.00 in money and at the same time withhold from the record the fact that the actual consideration to be received therefor was much more than the two yards aforesaid and $5,957.00.

"The actual consideration for the intended trade was not only the Jamesport and Princeton yards, but also $6,647.78, and the blind yard at Leon and the Ballew interest in the blind yard at Seymour, the last two being a part of the property owned by but which had been intentionally omitted from the inventory of the Ballew Estate.

"Publicity of such ownership by the Ballew estate of the two blind yards would have raised embarrassing questions as, to why they had been omitted from its inventory in the Mercer County probate court, and might force commencement of an ancillary Iowa administration at Leon or Seymour, with its attendant trouble and expense, and certainly would destroy the secrecy of Ballew's ownership, which he had carefully guarded for years. The same policy had been adopted by his employees, heirs, Stormfeltz and Eckels. All considered it essential to avoid destructive competition and consequent diminution in the value of the Ballew Company and the Hubacher yards at Leon and the Ballew Company and Eckels yards at Seymour. Imbued with this phobia, they all were equally anxious to do anything necessary to maintain the secrecy.

"Under date of June 27, 1912, in furtherance of the prospective trade, the Ballew Lumber Company, by D. D. Waldeck as vice president, and Frank Harrison as secretary, executed two bills of sale to relator, one for the Jamesport yard and the other for the Princeton yard. These are upon printed forms filled out at the instance of Ben C. Hyde by his brother, Ed. C. Hyde. They are in the handwriting of the latter, except the consideration named therein. That was not inserted until afterward. Although the exact time when it was done is not shown by the evidence it probably was not until on or after July 5, 1912. The amount so inserted was that mentioned in the aforesaid probate court order, namely $28,850.53 for the Princeton

yard, and $16,884.66 for the Jamesport yard.

"Under a date the same as the bills of sale, deeds also were executed by the lumber company to relator for the Princeton and Jamesport real estate. The lumber company's name was signed to the Princeton deed by the same persons who signed it to the bills of sale. The company's name to the Jamesport deed was signed by Charity Ballew as president and attested by Mr. Harrison as secretary. In these deeds the named consideration was the same as stated in the probate order, namely $6,065.-45 in the Princeton deed, and $4,717.36 in the Jamesport deed. The original deeds were not introduced, but defendant introduced certified typewritten copies of the record thereof. Such copies of course do not show whether the consideration stated in the originals was in handwriting different from the rest of the instruments, as is the case with the bills of sale, and it does not appear whether the consideration was originally left blank in the deeds the same as it was left blank in the bills of sale, and filled in later.

"The Princeton deed was not filed for record until July 8, 1912, and the Jamesport deed was not filed for record until July 10, 1912. The bills of sale never were recorded. The evidence does not show who held these bills of sale and deeds during the interval between the date of their execution and the date the deeds were recorded, but the fact is that they were not delivered to Stormfeltz until on or after July 5, 1912.

"July 2, 1912, Ben Hyde went to St. Joseph, the residence of Hubacher, who then was ill. There Hubacher executed a bill of sale for the Leon yard to 'P. E. Brady and Company'. Mr. P. E. Brady was and ever since 1903 had been the local manager of the Leon yard. This bill of sale was witnessed by Miss Edith Hubacher and by Ben C. Hyde. The name of Stormfeltz does not appear on this instrument, although he says that he went with Mr. Hyde to St. Joseph and that he was present when it was executed.

"The consideration named in this Hubacher bill of sale is $12,739.44. That is the amount of the next preceding inventory of the Leon yard as of 12/18–1911. The fact is that Hubacher did not receive that sum or any other for its execution. He did not own the Leon yard or any interest therein, and signed the bill of sale merely

for accommodation. Stormfeltz agrees with plaintiffs on that point, but he further says that in 1905 or 1906 he had a transaction with Hubacher whereby Hubacher had sold and conveyed the Leon yard by bill of sale drafted by Vinton Pike, a well known lawyer of St. Joseph, now deceased, to Stormfeltz who, ever since such transaction, had owned the Leon yard. That he had kept such alleged ownership secret from everyone, including P. E. Brady, the local manager of the yard. He says he had lost the Vinton Pike bill of sale that Hubacher originally executed. That it was he, Stormfeltz, and not Mr. Hyde, who had procured Hubacher to execute the new bill of sale on 6/2-1912, and that this new bill of sale was to take the place of the old one, to Stormfeltz. But the new bill of sale contains no such recitation. Instead of stating that it is executed in consideration of an old lost bill of sale by Hubacher to Stormfeltz it does not mention Stormfeltz from beginning to end. It runs to a different grantee and it names as its consideration, not the value which according to Stormfeltz, he paid for the yard in 1906, but the very latest ascertained book value of the yard as of 12/18–1911.

"On the same date, July 2, 1912, P. E. Brady, local manager of the Leon yard ever since 1903, came to Kansas City at the request of Stormfeltz, and in the office of the administrators in the Waldheim Building he and Stormfeltz entered into a written contract of a partnership under the name and style of 'P. E. Brady and Company' to conduct the Leon yard. This contract recites that the $12,739.44 inventory of the Leon yard as of 12/18–1911, is correct. Also that the interest of Stormfeltz in the yard is $11,739.44 and that of Brady $1,000.00 a total of $12,739.44. Also, that Brady would manage the yard and received as salary for his managerial services the sum of $900.00 per annum.

"On that occasion Brady paid to Stormfeltz, in money and notes, $1,000.00 for the interest which the partnership contract recites is vested in Brady. He thereby realized a long-cherished ambition to acquire an interest in the yard for himself. Brady previously had offered to make such purchase from Hubacher, not knowing that Hubacher owned no interest in the yard. Hubacher had not responded to Brady's proposal, but had not explained his silence. Hence when Brady saw what appeared to be an opportunity to buy such interest from Stormfeltz and at the same time save his job as local yard manager, he went into the transaction, though up to that moment he did not know and never had heard of Stormfeltz having any interest whatever in the Leon yard.

"On the same date, July 2, 1912, H. S. Eckels, at the request of Stormfeltz, came from Leon, Iowa, and went to the office of the Ballew administrators, Waldheim Building, Kansas City, Mo., where he entered into negotiations that resulted in a contract of partnership of that date with Stormfeltz to operate the Seymour blind yard in Eckels' name. This contract provides that Eckels is to manage the yard at an annual salary of $900.00, plus a $300.-00 year-end bonus if the yard makes over 8% on the investment. The contract also recites that the interest of Stormfeltz therein is $18,087.05, and the interest of Eckels, $3,415.37. It says 'both interests based on a statement of Jan. 1, 1912', which statement is set forth in the contract, fully itemized.

"The financial statement thus quoted in this partnership contract is, with one exception, identical with the annual inventory or 'recap' of the yard as written by Mr. Hyde in Kansas City on 1/1–1912. At the desk while Hyde wrote the recap was Mr. Eckels, to whom Hyde gave a duplicate. The one difference between the recap and the financial statement in the Stormfeltz-Eckels contract is that Mr. Hyde placed in the recap the name of T. W. Ballew as owner with Eckels and the name of Stormfeltz does not appear anywhere in the recap; whereas, in the contract the name of Stormfeltz is inserted wherever the name of Ballew appeared in the recap and in the contract the name of Ballew does not appear.

"The fact that after the inventory of 1/1–1912, was written, Eckels had paid the $500.00 balance of Ballew's interest in the 1910 profits, so that the $18,087.05 interest of Ballew was reduced to $17,587.05, was overlooked six months later when the Eckels-Stormfeltz contract was drawn. However, Stormfeltz afterward discovered this discrepancy and corrected it in the next recap made by him of the Seymour yard on 12/31–1912, wherein Stormfeltz adjusted the investment account of the Seymour yard downward to allow for the $500.00 payment.

"At the time of the execution of the foregoing Eckels-Stormfeltz contract of 7/2–1912, Stormfeltz wrote 'Paid' across

the face of the two Eckels notes, one for $12,500.00, dated 2/16–1907, payable to T. W. Ballew, and the other for $1,000.00 dated 4/26–1907, payable to T. W. Ballew's bank, and delivered them to Eckels. As heretofore stated, neither of these notes was endorsed by the payee. At the time Stormfeltz cancelled and surrendered them to Eckels, they belonged to the unadministered assets of the estate of T. W. Ballew. They did not represent any indebtedness of Eckels to Ballew or his estate. They were mere tokens of Ballew's ownership in the yard, but Eckels was glad to see them cancelled. No other consideration moved from Stormfeltz to Eckels for the partnership contract. The cancellation and surrender of the notes to Eckels on 7/2–1912, was done by Stormfeltz as an administrator of the Ballew estate, acting as trustee for the heirs, and not in his personal capacity. Although this fact was not explained to Eckels, it was known to and understood by Mr. Hyde and the Ballew heirs.

"Up to the time Stormfeltz made the partnership contract of 7/2–1912, Eckels never had heard of Stormfeltz owning or claiming to own any interest in the Eckels yard. In fact, he did not expressly claim such ownership on that occasion. But Eckels knew of Stormfeltz' connection with the Ballew family and that he was one of the Ballew administrators. When Stormfeltz produced the two notes above mentioned and proposed to cancel and deliver them to Eckels, the latter assumed, although he did not understand just what the conditions were, that it was all right to enter into the partnership contract with Stormfeltz. It was a contract whereby he had nothing to lose. He wanted to stay with the yard, and not see the controlling interest therein pass into the hands of a stranger who would have no use for his services, and he supposed that under the partnership contract the matter would somehow work out satisfactorily.

"The foregoing expectation of Eckels was fulfilled. The partnership between him and Stormfeltz continued until after relator attained majority. Then Eckels bought Stormfeltz out, in 1925. During that entire period Stormfeltz never allowed his name to be made public as owner of any interest in the Seymour yard. It was operated solely in the name of Eckels. The fact that Eckels was not the sole owner was kept a secret after the partnership contract was made as closely as it had

been ever since Ballew and Eckels first acquired the yard in 1907.

"Likewise, as to the Leon yard, Stormfeltz never allowed his name to be made public in connection therewith. After the partnership contract between him and Brady was made on 7/2–1912, it was operated solely under the name of 'P. E. Brady and Company' until some time during the year 1928, when Brady bought out Stormfeltz and thereby acquired for himself the entire interest therein.

"Stormfeltz testified that Ballew, at the time of his death, had no interest in the Eckels yard. That he acquired all the interest of Ballew in the Eckels yard by a transaction with Ballew about the year 1908, and had owned such interest ever since. That so long as Ballew lived, no one except himself and Ballew, not even Eckels himself, knew of his ownership. That after Ballew's death, he had kept it secret except that he had revealed it to Mr. Hyde on an occasion in 1912 when they were in Excelsior Springs. However, there is no credible evidence of him exercising any of the rights of such ownership until after his transaction with Eckels on 7/2–1912, and in his deposition taken by plaintiffs on 5/23–1930, Stormfeltz testified that he did not then own and that he never had owned any interest in the Eckels yard.

"Until after this suit was brought the Ballew heirs knew nothing of Stormfeltz' claim that Stormfeltz, before Ballew's death had purchased the Leon yard from Hubacher, nor of any claim by Stormfeltz that he had purchased Ballew's interest in the Seymour yard, and at the trial relator lodged timely objections as against the competency of Stormfeltz to testify to having had any such transactions with Hubacher and Ballew, on the ground that both of them were dead.

"On 7/5–1912, a meeting of the Ballew heirs and Stormfeltz was held at the office of the administrators in the Waldheim Building, Kansas City, Mo. The purpose was to close the last above mentioned trade with Stormfeltz, for which the probate court order of 6/25, the conveyances of 6/27, and the proceedings of 7/2–1912, were preparatory.

"The meeting was called by Ben Hyde. He suffered a stroke in 1927, since which time he has been unable to speak or write, mentally incompetent, and under guardianship. Naturally, he was not and could not be produced as a witness at the trial of this

case, and the court does not have the benefit of his testimony. The facts herein found with reference to the trade are from the records that he made, and the testimony of the others who were present at the meeting.

"Those present at the meeting of 7/5–1912, in addition to Mr. Hyde, were Mr. Stormfeltz, Mrs. Charity Ballew, Mrs. Jessie B. Hyde, and Mrs. Winifred Harrison and husband, Frank D. Harrison. The office was the same as that of the Ballew Lumber Company, of which D. D. Waldeck was vice president, and although he took no part in the meeting, he was well acquainted with the Ballew family, knew what the meeting was for, and was casually present part of the time and heard much of what was said.

"At the meeting, Stormfeltz stated to the heirs his proposal. It was to exchange relator's lumber stock, at its book value, for specific lumber yards at their book value, namely, the Princeton, Jamesport and Leon yards, and the interest owned by the Ballew estate in the Eckels yard at Seymour, plus the difference in cash.

"For convenience and brevity in the following statements of these findings, the small interest of Eckels in the Seymour yard will be temporarily ignored, and the yard will be mentioned as though owned in its entirety by the Ballew estate, the same as was the Leon yard.

"Mr. Hyde stated that his wife, who on 5/8–1912, sold her Ballew Lumber Company stock, did not want to acquire any interest in the stock of relator, but that she was willing for the trade to be consummated as between Stormfeltz on the one hand and Mrs. Ballew and Mrs. Harrison on the other.

"Mrs. Ballew and Mrs. Harrison said that they already had bought Mrs. Hyde's stock, and that they were willing to take over relator's stock, thereby acquiring the entire issue, and that the trade proposed by Stormfeltz was agreeable to them.

"The book value of the stock was adjusted to the date of the meeting, July 5, 1912, at $81,343.99. The other book values were, Princeton yard, $28,941.83, the Jamesport yard, $15,427.89, the Leon yard, $12,739.44, the Seymour yard, $17,587.05.

"In the trade, relator was to part with a 100% interest in his lumber stock and in return therefor he was to receive a 100% interest in the four yards. There was no difficulty about the Princeton and Jamesport yards, because Mrs. Ballew and Mrs. Harrison could convey to Stormfeltz a 100% interest therein, through their control of the lumber company that owned them, and nothing was necessary except to deliver to him the aforesaid bills of sale and deeds executed by the lumber company on 6/27–1912.

"But as to the Leon and Seymour yards the situation was not so simple. Those yards belonged, not to the lumber company, but to the Ballew estate, in which Mrs. Ballew and Mrs. Harrison owned only a one-half interest, hence only a one-half interest in the Leon and the Seymour. The other half interest was owned equally by Mrs. Hyde and by relator. Hence it was necessary for Mrs. Ballew and Mrs. Harrison to pay Mrs. Hyde for her 25% interest in the Leon and the Seymour, and also to pay Stormfeltz, as relator's guardian, for relator's 25% interest in those two yards, in order to put themselves in position to trade to relator a 100% interest therein. Otherwise, even after Mrs. Ballew and Mrs. Harrison had purchased Mrs. Hyde's 25%, still relator would receive in exchange for a 100% interest in his stock only 75% interest in the Leon and Seymour yards, when he was in fact entitled to receive 100% interest therein.

"Mr. Hyde was the accountant, recorder, general manager and business mind of the Ballew estate. He clearly perceived the above conditions. He had prepared a financial statement of how the trade proposed by Stormfeltz would work out. He read this statement at the meeting of 7/5–1912 to Stormfeltz and the other heirs, and it was passed around among them and examined.

"The statement is in Mr. Hyde's handwriting. It is a record written on ledger paper on which Hyde kept a current account of the payments and transfers from the Ballew estate to Stormfeltz, as guardian, from time to time, commencing with the first distribution Nov. 24, 1911, of the lumber company stock, and extending down to and including a $600.00 cash distribution made October 27, 1913. This is a record made by Mr. Hyde as the duly authorized, recognized, qualified and acting mutual agent for that purpose of the Ballew heirs and Stormfeltz as guardian. His words and acts in that connection are those of the heirs and Stormfeltz.

"The following is a full copy of the above record, which at the trial was called the 'Ben Hyde Memorandum'.

"Distributions to Stormfeltz for relator from unadministered assets made during

| | | | | | |
|---|---|---|---|---|---|
| 1911 | | | | | |
| Nov. 24 | 2499 shares T.W.B.L. Co. stock | | | | |
| 1912 | | | | | |
| Mch. 27 | Cash distribution................ | | | | $ 40,000.00 |
| Ju. 5 | Sold ¼ int. T.W.B.L. Co......... | 81,932.73 | | | |
| " " | Less ¼ Gen. Office Exp.......... | 588.74 | | | |
| | | | 81,343.99 | | |
| " " | Cash distribution 2 cks.......... | | | | 12,410.00 |
| " " | Purchased Jamesport Yard...... | 15,427.89 | | | |
| " " | " Princeton " ...... | 28,941.83 | | | |
| " " | " Leon " ...... | 12,739.44 | | | |
| " " | " Pt. Seymour " ...... | 17,587.05 | | | |
| | | | 74,696.21 | | |
| " " | Cash received in trade ck........ | | 6,647.78 | | 6,647.78 |
| " " | Yard Investment Actual, in Princeton, Jamesport, Leon and Seymour ........................ | | | | 74,696.21 |
| 1913 | | | | | |
| Jan. 27 | Cash Distribution.............. | | | | 1,393.65 |
| | | | | | 135,147.64 |
| Apr. 3 | ¼ Sale Home to Casteel........ | | | | 1,625.00 |
| May 17 | Cash Distribution.............. | | | | 6,200.00 |
| June 30 | " " .............. | | | | 341.95 |
| Oct. 27 | " " .............. | | | | 600.00 |
| (Memo.) | ....................... | 143,914.59 | | | |
| | | 140,507.94 | | | |
| | | 3,406.65 | | | |

"The list of distributions contained in the foregoing record includes all that represented a divided interest set over to Stormfeltz for relator during the period which the record covers, both those made from administered and also those made from unadministered assets of the Ballew estate. There were three such distributions of administered assets, all shown by the probate records, and six such distributions made from unadministered assets, namely:

"Distributions to Stormfeltz for relator from administered assets during the period covered by the Ben Hyde Memorandum—

11/24-1911, Ballew Lumber Co. stock 2499 shares.
3/27-1912, Cash—$40,000.00.
5/17-1913, Cash—$ 6,200.00.

the period covered by the Hyde memorandum were:

7/ 5-1912, Cash for blind yards at Leon and Seymour, $12,410.00
1/27-1913, Cash for blind yard at Brimson 1,393.65
4/ 3-1913, Cash for sale Ballew home to Casteel 1,625.00
6/30-1913, Cash from Ballew, H. S. and H. a/c 341.95
10/27-1913, Cash from B. H. S. and H. a/c 600.00

"All of the foregoing distributions are found correctly recorded by Mr. Hyde in his memorandum under their proper dates. He does not distinguish between distributions from administered and those from unadministered assets. He sets them all

down in the order of the time when they were made.

"At the time of the meeting of July 5, 1912, the memorandum in its present form of course had not been and could not have been completed beyond that date. The July 5 entries therein comprise the items which relate to the trade that was closed on that date. These items are as follows:

| 1912 | | | | | |
|---|---|---|---|---|---|
| Ju. 5 | Sold ¼ int. T.W.B.L. Co........... | | 81,932.73 | | |
| " " | Less ¼ Gen. Office Exp........... | | 588.74 | | |
| | | | | 81,343.99 | |
| " " | Cash distribution 2 cks........... | | | | 12,410.00 |
| " " | Purchased Jamesport Yard........ | 15,427.89 | | | |
| " " | " Princeton " ........ | 28,941.83 | | | |
| " " | " Leon " ........ | 12,739.44 | | | |
| " " | " Pt. Seymour " ........ | 17,587.05 | | | |
| | | | | 74,696.21 | |
| " " | Cash received in trade ck......... | | | 6,647.78 | 6,647.78 |
| " " | Yard investment Actual, in Princeton, Jamesport, Leon and Seymour | | | | 74,696.21 |

"The three items which Hyde placed in the extreme right-hand column of the entries of July 5, are the ones which show exactly what Stormfeltz was to receive, viz.—

| | | |
|---|---|---|
| Cash, as a distribution, in two checks | | 12,410.00 |
| Cash as boot money in the trade, in one ck .............. | 6,647.78 | |
| The four yards at actual (or book) value .............. | 74,696.21 | |
| Total for relator's stock .... | 81,343.99 | 81,343.99 |
| Cash, plus yard value and boot money to Stormfeltz ....... | | 93,753.99 |

"The three checks mentioned in the first and second items of the foregoing were by the administrators. They did not take credit for or make any mention of these checks in their reports to the probate court. The reason is that the checks did not come from administered funds. They were drawn against unadministered funds of the Ballew Estate.

"As to the items of July 5, 1912, in the Hyde memorandum, the first is the book value of relator's stock, as of Jan. 1, 1912,

$81,932.73. This was diminished by the second item of $588.74, which was one-fourth of the first six months' general office expense for the year 1912. This deduction left the third item, viz. the book value as of that date, standing at $81,343.-99, when Stormfeltz exchanged it for the four yards and $6,647.78 boot money mentioned in items 4-8.

"The book value of the remaining three-fourths of the stock, owned by Charity Ballew and Winifred Harrison, was three times the book value of relator's one-fourth interest in the stock, or $244,031.97, so that the entire book value of all the stock was $325,375.96.

"To further the trade Mr. Hyde assembled what relator calls a 'hotch potch', composed as follows: (1) The Leon and Seymour yards, the combined book value of which was $30,326.39. (2) Checks drawn against unadministered Ballew estate funds, $6,647.78, and $255.73, which total $6,903.51. (3) Checks against unadministered Ballew estate funds, $2,192.22 and $10,217.78, which total $12,410.00. The combined value of the Leon and Seymour yards and the four checks above mentioned is $49,640.00, one-fourth of which is $12,-410.00, which was the undivided interest of each of the heirs in the hotch potch. That results from the fact that the Leon and Seymour yards and the four checks, unlike the Ballew Lumber Company stock, were owned in common by the four heirs, so that the distributive value of each therein was $12,410.00.

"Mrs. Ballew and Mrs. Harrison purchased Mrs. Hyde's $12,410.00 interest in this hotch potch. They paid for it by delivery to her through Mr. Hyde of the above mentioned $255.73 check, and the

execution of their joint secured note to her for $12,154.27. These total $12,410.00. Mrs. Hyde accepted the check and note as payment in full for her interest in the hotch potch, and thereby her interest therein, which included her 25% interest in the Leon and Seymour yards, was centered in Mrs. Ballew and Mrs. Harrison.

"Mrs. Ballew and Mrs. Harrison also paid Luther Stormfeltz, as relator's guardian, for relator's interest in the hotch potch, by delivery to Stormfeltz, through Mr. Hyde, of the $2,192.22 and $10,217.78 checks aforesaid, which total $12,410.00, and thereby relator's interest in the pool, including his 25% interest in the Leon and Seymour passed to Mrs. Ballew and Mrs. Hyde.

"To evidence the foregoing values and the distribution thereof to the heirs, Ben Hyde, at the meeting, presented each of them with a receipt which he or she signed. These four receipts are in language identical, except for the name inserted therein. The one signed by Stormfeltz reads as follows:

" 'Kansas City, Mo. 7/5-1912
" 'Received from Stormfeltz and Hyde Admrs.,
" 'Twelve Thousand Four Hundred & ten xx/100 Dollars
" 'Distribution on Sale of T. W. Ballew Lbr. Yards #2
" '$12,410.00
" 'L. J. Stormfeltz, Guardian'

"The money represented by said receipt was paid to Stormfeltz in two checks as stated in the Ben Hyde memorandum. One was a check of $2,192.22 which Stormfeltz deposited on the following day (6/6-1912) in a personal account which he opened on that day in the Commerce Trust Company, Kansas City, Missouri, in his own name. The other check was for $10,-217.78, which Stormfeltz deposited, on Monday, 6/8-1912, in his personal account in the Farmers Bank at Princeton, Mo.

"The two checks last aforesaid eliminated relator's interest in the hotch potch. With Mrs. Hyde's interest therein also eliminated, the remainder of the hotch potch belonged to Mrs. Ballew and Mrs. Harrison. It now consisted of nothing except the two Iowa yards and check No. 1 for $6,647.78.

"Thereupon Stormfeltz transferred 100% of relator's stock to Mrs. Ballew and Mrs. Harrison, and in exchange therefor they relinquished to relator their interest, now 100%, in the Leon and Seymour yards, and also the 100% interest of the lumber company in the Princeton and Jamesport yards. The book value of these yards was: Jamesport, $15,427.89, Princeton, $28,941.83, Leon, $12,739.44, Seymour, $17,587.05, total $74,696.21, as shown by the evidence, including the Ben Hyde memorandum. The difference between the sum last aforesaid and the book value of the stock $81,343.99, is the amount of $6,647.-78. That is the second amount stated by Mr. Hyde in the right-hand column of his memorandum. It is the exact amount represented by check No. 1.

"The last named sum is the amount paid to Stormfeltz as 'boot money' by Mrs. Ballew and Mrs. Harrison through Ben Hyde. He made the payment by the simple act of transferring to Stormfeltz the above mentioned $6,647.78 check. This check Stormfeltz deposited, on 6/6-1912, in his personal account in the Commerce Trust Company. This $6,647.78, plus check No. 3, above mentioned, for $2,192.22, total $8,-840.00, which is the initial deposit with which Stormfeltz opened that account.

"Three of the four checks mentioned above have been found by relator and introduced in evidence. They all are signed 'Stormfeltz and Hyde by Ben C. Hyde and L. J. Stormfeltz'. They are drawn upon the Stormfeltz and Hyde account in the Commerce Trust Co. They are the first checks drawn against said account. They are all dated 7/5-1912, and numbered consecutively, No. 1, No. 2, and No. 3. The cancellation marks thereon show that they all were paid by the trust company on Saturday, 7/6-1912. The three checks are as follows:

"In the original copy of the Findings of Fact, this page consists of photostats of three checks, issued 7/5-1912, namely; No. 1, payable to Jessie B. Hyde for $6,647.78, No. 2, payable to Jessie B. Hyde, for $255.-73, and No. 3, payable to L. J. Stormfeltz for $2,192.22.

"The endorsement of check No. 2 for $255.73, which went to Mrs. Hyde in payment of the difference between the joint note of Mrs. Ballew and Mrs. Harrison for $12,154.27 and $12,410.00, is merely 'Jessie B. Hyde per Ben Hyde'. This check is regularly entered in the account books kept by Mr. Hyde as trustee for his wife, as having been received by her from the Ballew estate. It is not men-

tioned by Mr. Hyde in his memorandum, because it did not go to Stormfeltz. The Memorandum relates only what Stormfeltz received.

"Check No. 1, for $6,647.78, in which Jessie B. Hyde is named as payee, is endorsed as follows:

"'Pay to the order of L. J. Stormfeltz, Jessie B. Hyde by Ben C. Hyde'.

"Beneath the foregoing is the endorsement of defendant L. J. Stormfeltz, written in his own hand.

"Check No. 3, for $2,192.22, which is payable direct to Stormfeltz, bears his original endorsement, written in his own hand.

"Relator has not been able to find the fourth check for $10,217.78, and therefore it was not introduced in evidence. Relator knows no more about the account on which it was drawn than he does about the account against which the $6,500.00 was drawn that was credited to the Stormfeltz and Hyde account on July 6, 1912. Yet there stands the $6,500.00 credit in that account, raising the balance therein to an amount sufficient to cover the aforesaid checks Nos. 1, 2 and 3. This sum did not come from any bank account of the administrators of administered assets of the Ballew estate. They produced the money from an unknown source, which conclusively shows that the administrators had resources in some account somewhere, which relator has not been able to find, and against which they could have drawn and did draw the check to Stormfeltz for $10,217.78.

"(1) The testimony of Winifred Harrison, who was present at the meeting. She does not claim to be able to recall from memory the description of the check, but did testify that there was such a check, and that it was delivered to Stormfeltz in the trade of 7/5-1912, as a part of the $12,410.00, which he acknowledged by his receipt of that date.

"(2) The Ben Hyde memorandum, which was made by him as agent and trustee for Stormfeltz and the Ballew heirs, and who, according to all the testimony, including that of Stormfeltz, as such agent and trustee handled the exchange of relator's stock, and which memorandum was read by Hyde to and approved by Stormfeltz and all the Ballew heirs at the meeting of 7/5-1912, and which says that Stormfeltz received the $12,410.00 in two checks, one of which for $2,192.22 is in evidence, showing that the other had to be for $10,217.78.

"(3) The fact that Stormfeltz deposited $10,217.78 in the Farmers Bank at Princeton on 7/8-1912, the Monday following the date of the trade, and that Stormfeltz did not at the trial give any credible explanation as to where he got the money. He was a comparatively poor man on Nov. 8, 1911, when he stated in writing over his signature that his entire financial worth, including his Princeton residence, was only $7,000.00. Nothing had occurred in the short period of eight months between that date and 7/8-1912, that could have increased his wealth to a point where it was possible for him to own personally the $8,840.00 that on 7/8-1912, he had on deposit to his individual credit in the Commerce Trust Company at Kansas City, Missouri, and the $10,217.78 in the Farmers Bank, whereby his average weekly credit balance which for many previous weeks had been less than $200.00, was suddenly increased on 7/8-1912, by the amount of this check, viz., $10,217.78.

"(4) The receipt executed by Stormfeltz as guardian, dated 7/5-1912, for $12,410.00, which he therein states to be for 'Distribution on sale of T. W. Ballew Lbr. yards No. 2'.

"The fact that, with the one exception of the $500.00 that on 1/24-1912, was paid by Eckels as the balance of Ballew's 1910 profits on the Seymour yard, the account from which Stormfeltz and Hyde obtained the $6,500.00 and all other money that they placed in the Stormfeltz and Hyde account which raised its balance to $9,095.73 on 7/6-1912, and that the account from which they obtained the $10,217.78 which Stormfeltz placed in his personal account at the Farmers on 7/8-1912, had not been disclosed by Stormfeltz and is unknown to relator, does not do away with the controlling fact that Stormfeltz in fact received and appropriated the money.

"Stormfeltz now says to his former ward, in effect: 'Until you show not only the exact account from which the people who paid the money to me themselves obtained that money, but also show the exact account from which it originated before it was paid to them in order that they might make such payment, I have a right to keep the money without liability of myself or sureties to you, even though I obtained it from your stock.'

"A man of very large means, accustomed to handling great sums of money day by day, might possibly forget, though he would not be apt to do so, where he obtained even so large a sum as ten or twenty thousand dollars, which he placed to his personal account on a certain date. But Stormfeltz was a man of very small means. The deposits he made on Saturday, 7/6-1912, and on Monday, 7/8-1912, were the largest he ever had made in his personal accounts, so far as the evidence shows. There is no evidence that the money came through some find, or lottery, or other sudden influx of wealth, accruing to Stormfeltz personally. No such event occurred, and there is no claim that it did occur.

"Hyde, by reason of disability, cannot tell the account from which the money came that went into the Stormfeltz and Hyde account; or against which the check was drawn to Stormfeltz for $10,217.78; and Stormfeltz, who is one person now capable of testifying, who of all others should know, does not tell. His failure to disclose the truth does not wipe out the persistent and stubborn fact that he did obtain the $6,647.78 and the $2,192.22 and the $10,217.78, and that he deposited those large sums in his personal accounts which relator has introduced in evidence; and that Stormfeltz obtained the money solely by trading off relator's stock and in consideration for such trade. There was no other way he could have obtained it.

"Stormfeltz never reported to the probate court the fact that he had received the $12,410.00. He never reported to the probate court that he had received the Leon and Seymour yards. He never reported to the probate court that he had received $6,647.78. He never accounted to relator for the $6,647.78, nor for the $12,410.00, nor for the Leon and Seymour yards.

"The explanation by Stormfeltz of the $12,410.00 receipt is that it was given merely to clear the administrators of ostensible but not real liability for administered but worthless assets of the Ballew estate, in order to pave the way for its final settlement. But he does not explain what was meant by the words of the receipt 'T. W. Ballew Lumber yards No. 2' and does not describe any such administered assets and the estate, so far as the evidence goes, had no administered assets that were worthless. The only receipt Stormfeltz ever gave for uncollected administered assets of the estate is in evidence. It is a joint receipt dated May 17, 1913, which the heirs and

Stormfeltz signed on a single instrument that is on file in the probate court. It was given at the conclusion of the administration of the Ballew estate. It is for $10,094.39. It amounted to only $2,523.59 for each of the heirs. That receipt could not account for or explain an individual receipt by each of them which totaled four times $12,410.00, given 7/5-1912, almost one year before the Ballew estate administration was closed. The attempted explanation by Stormfeltz of the $12,410.00 receipt last aforesaid is not credible.

"As conclusively showing that the Stormfeltz and Hyde account was of funds belonging to the unadministered assets of the Ballew estate, and that 'No. 2', as used in the $12,410.00 receipts, meant 'unadministered assets' are the following facts.

"No checks were paid from this account from the time it was opened 1/15-1912, until the three checks, Nos. 1, 2 and 3, dated 7/5-1912, were cashed on the following day. Those checks consumed the whole of the $9,336.43 balance of the account except only $240.70.

"After the balance had thus been reduced to $240.70, a series of small credits were entered amounting to only $5.80, until on 1/23-1913, the balance stood at $246.50. On that date, the money realized by the sale to Frank Harrison of the Ballew interest in the Miner & Frees blind yard at Brimson, Missouri, $5,338.83, was deposited in the account, raising its balance to $5,785.33.

"This Brimson money, of course, belonged to the Ballew estate. Frank Harrison had Stormfeltz and Hyde notify Miner & Frees that Harrison had bought the Ballew interest in the Brimson yard, over the signatures of both of them as administrators.

"This $5,538.83 was not entered in the probate records of the administrators. As to it those records are silent. The undisputed fact is that the $5,538.83 constituted unadministered funds of the Ballew estate. The fact that it was deposited in the S. & H. account shows what the purpose of the account was. Its purpose was to receive funds of that character, i. e., unadministered Ballew funds.

"Next in order are four checks against the Stormfeltz and Hyde account, all dated Jan. 27, 1913, each for $1,393.65, one to each of the three heirs and one to Stormfeltz. Three of these checks were introduced by relator in evidence. The fourth,

to Stormfeltz, relator could not find, but he did find from the account itself that it is debited to the S. & H. account, that is, it was cashed by Stormfeltz, on the day it was drawn, Jan. 27, 1913.

"These four checks were a distribution to the Ballew heirs of the $5,538.83 (plus $35.77) realized in the sale to Harrison of the Ballew interest in the Miner & Frees blind yard at Brimson. In addition to the $1,393.65 checks of 1/27-1913, relator found all four of the corresponding receipts, all dated 1/27-1913, for this distribution; and introduced them in evidence. The one to Stormfeltz is signed by him as 'Guard, Andrew Jean Stormfeltz'. In language and signature these four receipts are identical with the four receipts of 7/5-1912, except that in those of 1/27-1913, the date and amount are different, and the word 'Second' is prefixed before the word 'distribution', so that it reads 'Second distribution, T. W. Ballew Lumber Yards No. 2'. The following is an exact copy of the $1,-393.65 receipt for this distribution that was signed by Stormfeltz, the others being identical therewith.

"'Princeton, Mo., Jan. 27, 1913

"'Received of Stormfeltz and Hyde Admrs.

"'Thirteen Hundred and Ninety-three 62/100 Dollars

"'Second Distribution on sale T. W. Ballew lumber yards #2

"'$1,393.65/100 L. J. Stormfeltz, Guard.
"'Andrew Jean Stormfeltz.'

"The $1,393.65 distribution which Stormfeltz acknowledges in the above receipt is the first 1913 item recorded by Ben Hyde in his memorandum. Yet the administrators took no credit on the record of the probate court for the distribution evidenced by the receipts of 1/27-1913, and none of said receipts were filed in said court. With respect thereto those records in the Ballew estate are as silent as they are with respect to the $12,410.00 receipts of 7/5-1912.

"The final settlement of the administrators made 5/17-1913, showed only the exhaustion of all the administered assets of the estate of Ballew, and the list of these assets made no mention of any blind yards, nor of any money which entered the No. 2 account from which Stormfeltz received the $12,410.00 on 7/5-1912, and the $1,393.-65 on 1/27-1913. That is because of the settled and consistently followed policy of keeping all items that flowed through the

Stormfeltz and Hyde account out of the record of the probate court. To reveal such items would be to reveal the ownership by Ballew of the blind yards.

"After the distribution of 1/27-1913, there followed a series of small interest credits to the Stormfeltz and Hyde account, credited by the trust company on the deposits therein, and also two unknown deposits of $189.32 and $149.75, and one check dated Jan. 28, 1913, of $300.00 to Mr. Hubacher. The purpose of that check is not shown.

"Then, after the close of the administration, an unknown check for $6.49 was drawn against the account on 6/12-1913, and on the same date the balance therein, $149.80 was transferred to the new account in the Commerce Trust Company in the name of 'Ballew, Harrison, Stormfeltz and Hyde', to which, as hereinbefore mentioned, the balance of administered funds then remaining in the hands of the administrators also was transferred, thus merging the two accounts into one. That was done after the close of the administration, when no further reports were to be made to the probate court and all disbursements of Ballew funds could thenceforth be made privately as between the heirs.

"The book of original entry kept by Ben Hyde for the heirs, in his own handwriting, with this Ballew, Harrison, Stormfeltz and Hyde account, contains opening entries as follows:

| 1913 | | Dr. | Cr. |
|---|---|---|---|
| May 17 | Final Distribution TWB Est. | $10,094.39 | |
| | Uncollected TWB assets per probate receipt signed by heirs and Stormfeltz | | $ 9,935.53 |
| | Cash, Estate | | 153.86 |
| | E. M. Miller T.W.B. No. 2 | | 98.90 |
| | Ora A. Shockley T.W.B. No. 2 | | 95.10 |
| | Accts with Hubacher T.W.B. No. 2 | | 243.30 |
| | Cash, T.W.B. No. 2 | | 149.80 |
| May 19 | Final Distribution T.W. B. No. 2 | 587.10 | |
| | | $10,681.49 | $10,681.49 |

"The first credit item, $9,935.53, is the amount of the uncollected notes, etc., of the Ballew estate, as shown by the final settlement, and for which the heirs and Stormfeltz acknowledged receipt by an instrument in writing filed in the probate court at the time of the final settlement.

"The second item, 'Cash, Estate, $158.-86', is the cash balance in the 'Hyde and Stormfeltz, Administrators' account in the Commerce, through which administered funds were handled, and is also the cash balance shown in the final settlement of the administrators.

"The remaining four credit items all are entitled 'T. W. B. No. 2' and amount to $587.10. Those items never were probated. They include the Miller and Shockley notes, and also an item entitled 'Accounts with Hubacher, No. 2'. This last mentioned item disclosed the fact that Hubacher, who had worked first for Ballew and then for his administrators in collecting the accounts of the blind yard at Brimson, still had in his possession for collection $243.30 of No. 2, or unadministered accounts of Ballew, at the time the administrators made final settlement.

"The fourth credit item is the one which covers the cash balance of the Stormfeltz and Hyde account of unadministered funds in the Commerce. It reads, 'Cash, T. W. B. No. 2, $149.80.'

"Here Ben Hyde expressly designated the Stormfeltz and Hyde accounts as 'T. W. Ballew No. 2'. That is the same expression which he uses in all four of the $12,410.00 receipts of 7/5-1912, and in all four of the $1,393.65 receipts of 1/27-1913, except that in the eight receipts he speaks of blind yards as 'Lumber Yards No. 2'. All money paid on those receipts was by checks drawn against the Stormfeltz and Hyde account.

"These facts show that the account was of funds belonging to unadministered Ballew estate assets, and that Mr. Hyde designated those assets as 'No. 2' and kept the money derived from the unadministered assets in this Stormfeltz and Hyde account, which he called the 'No. 2' account. The expression in the $12,410.00 receipts of 7/5-1912, and the four $1,393.65 receipts of 1/27-1913, viz., 'T. W. Ballew Lumber Yards No. 2', means blind yards which belonged to Ballew but which were excluded from the administered assets of his estate and disposed of as unadministered assets thereof.

"Stormfeltz does not, in his annual settlement, filed in the probate court as guardian of relator, on 3/8-1913, show the source of the above mentioned $1,393.65, and does not therein show any detail with respect to said amount; but in said settlement, which is his first annual, he does debit himself with said amount of $1,393.65, as additional inventory received by him for relator.

"Stormfeltz, in said first annual settlement, also debited himself with the Princeton and Jamesport yards, but not at their true book value. Instead, he debited himself on account thereof at the inflated valuation mentioned in the probate order of 6/25-1912; and then, during the next five or six years, he gradually got rid of the excess debit by omitting to debit himself with the earnings of those two yards. This process he continued until finally such earnings, less various sums that he abstracted from the yards during that period, equalled the excessive valuation which he originally placed thereon. By such means he finally brought the amount with which on the probate court records he stood debited for those yards, into balance with their book value during the year 1918. The effect which he thus ultimately produced was exactly the same as if he had debited himself on account of the Princeton and Jamesport in his first annual with the true book value thereof, as such book value stood on 7/5-1912, being the value at which in the trade he had accepted those two yards, which was $28,941.83, for the Princeton and $15,427.80 for the Jamesport, as stated by Ben Hyde in the entries in his memorandum of 7/5-1912.

"Stormfeltz did not in said first annual settlement, or in any subsequent settlement, account to relator for, or in any manner mention, the $6,647.78 boot money, which he received in the trade of 7/5-1912; and he did not, in his first annual or in any other settlement, account to relator for, or in any manner mention, the Leon and Seymour yards, which in the exchange he had obtained for $30,326.49 of the value of relator's stock. Instead of so doing, he appropriated to himself both of said yards, hence that much of the value of the stock, together with the $6,647.78, a total of $36,974.27 and also the $12,410.00, and never has accounted to relator for the same."

Continuing Counts I–III.

Upon the facts so found the trial court concluded that the relator was entitled to recover judgment in the sum of $36,974.27 on the first count of the petition, and the sum of $12,410 on the third count, together with interest on each sum.

Appellants have complained that the findings of fact relative to these first and third counts of the petition contain argumentative matter and also include

findings of evidentiary facts positioned or interwoven with findings of ultimate facts and that confusion results which would justify reversal. But the federal statute requires the appellate court to give judgment after examination of the entire record before it without regard to defects which do not affect the substantial rights of the parties (28 U.S.C.A. § 391) and if the ultimate facts found upon sufficient competent evidence support the judgment, it must be sustained. Winnett v. Helvering, 9 Cir., 68 F.2d 614; Clyde Equipment Co. v. Fiorito, 9 Cir., 16 F.2d 106. The mere inclusion in the findings of irrelevant evidence will not require reversal. Sugarine Co. v. Werthan Bag Co., 6 Cir., 19 F.2d 919; O'Reilly v. Campbell, 116 U.S. 418, 6 S.Ct. 421, 29 L.Ed. 669. The State practice does not control the interpretation of Section 391, supra. Burke Grain Co. v. St. Paul-Mercury Indemnity Co., 8 Cir., 94 F. 2d 458; Camp v. Gress, 250 U.S. 308, 39 S.Ct. 478, 63 L.Ed. 997; Bradford v. Southern Railway Co., 195 U.S. 243, 250, 25 S.Ct. 55, 49 L.Ed. 178; Graham v. Bayne, 18 How. 60, 15 L.Ed. 265; Bank of Waterproof v. Fidelity & D. Co., 5 Cir., 299 F. 478; Jones v. United States, 8 Cir., 135 F. 518.

██ The appellants duly filed assignments of error in which they charge that there was no competent evidence in the record to support the court's several findings of fact above set forth and they set out specifically forty-four of the findings so claimed to be unsupported by competent evidence. They particularly stress the contention that the plaintiff's Exhibit 48 which at the trial was called the "Ben Hyde Memorandum" was erroneously received in evidence and that it was incompetent.

It is a financial statement purporting to epitomize several transactions into the form of a record of account and is proven to be in the handwriting of Mr. Ben C. Hyde, who at the time of the entries had the responsibility of making and preserving such records for the parties concerned in the transactions. Mr. Hyde's sickness incapacitated him from giving testimony and the trial court fully sets forth in the above findings the identification and all the circumstances constituting the foundation for the admission of the document in evidence. It is apparent that many of the other findings were based upon and related to this Exhibit 48, and if it was not competent the error in receiving it in evidence was prejudicial.

The appellants' strenuous insistence upon the incompetence and inadmissibility of the Exhibit 48 (although repeated throughout their briefs) has not been argued separately as one of the "points to be argued" (Rule 14-5), but we find it argued in the brief (1) that the exhibit was "a mere private writing of a third person, not kept in the ordinary course of business", (2) that the court did not find when the entries thereon were made, (3) that it was not the best evidence because the "probate court records of the exchange of the lumber company shares of stock were the best evidence * * * and could not be impeached by oral or otherwise extraneous evidence."

We think the testimony fully sustains the trial court's finding that Exhibit 48 was a record made by Mr. Hyde as the authorized agent of the Ballew heirs and the guardian Stormfeltz to evidence their mutual understandings, agreements and transactions at the time when, and at the place where the business was done.

It was not an ex parte memorandum or narrative of transactions. It was a writing that was read to the guardian and to the parties, including the guardian, who were then dealing and contracting among themselves, and the guardian in common with the other parties committed himself to it as a contracting party and on the strength of it money and property of great value changed hands. Although it was not signed by any one, the document was plainly a part of the res gestae and necessary to be considered in the inquiry as to what was done or agreed to by the parties when the record was made.

██ Cases are cited in which it is held that a memorandum successfully resorted to to refresh the recollection of a witness does not therefore become independent evidence or admissible as such,[3] but we think they are without application. The document was admissible as part of the res gestae and those witnesses who were

---

[3] Traber v. Hicks, 131 Mo. 180, 32 S.W. 1145; Crowell Bros. v. Panhandle Grain and Elevator Co., 8 Cir., 271 F. 129; Reineke v. United States, 8 Cir., 278 F. 724; Neff v. Neff, 96 Conn. 273, 114 A. 126; State v. Burns, 25 S.D. 364, 126 N.W. 572.

present and agreed to it when it was made and submitted to them were properly permitted to refer to it when testifying what was done pursuant to and in accordance with it. Charles H. Fuller Co. v. St. Louis W. Drug Co., 219 Mo.App. 519, 282 S.W. 535, 538; Traber v. Hicks, 131 Mo. 180, 186, 32 S.W. 1145; State v. Patton, 255 Mo. 245, 254, 455, 164 S.W. 223; Bredel v. Parker-Russell M. & M. Co., Mo.App., 21 S.W.2d 932, 935; Britian v. Fender, 116 Mo.App. 93, 92 S.W. 179; House Wrecking Co. v. Sonken, 152 Mo.App. 458, 133 S.W. 355; Milne v. Chicago etc. Railroad, 155 Mo.App. 465, 135 S.W. 85, 88.

Appellants' assignment which sets out forty-four of the court's findings separately and asserts error as to each one in that there was no competent evidence to support it, has afforded occasion to compare each one of the questioned findings with the evidence in the record concerning the same.

■ The issues of fact to be decided by the court were sharply and clearly drawn after the evidence had all been taken. The ward presented his requests for findings and the defendants submitted a motion and request that the same be refused and not given. The motion takes up some eighteen printed pages of the record and was adapted to call the trial court's attention particularly to the details of the evidence and their relation to the requested findings. After the motion had been heard and overruled, the defendants submitted their requests for findings drawn up in the light of the requests made by the ward and the arguments had before the court on the objections thereto, and they take up some thirty-five pages of the record. They are painstakingly prepared and formulated to meet what had gone before and descend to the details and particulars of the evidence relative to each of the counts reflecting the defendants' position on all the points in dispute. By comparison of the findings made by the court and those requested, we are enabled to discern the relevancy of the evidence in the record and the respective contentions of the parties as to the facts to be deduced therefrom. On examining the record we conclude that each of the forty-four findings so attacked is rested upon some substantial evidence and must be taken as true on this appeal.

■ The point is separately argued that there was no competent evidence to sustain the finding "That Ballew. owned the Leon, Iowa, lumber yard or any interest therein at the time of his death", but the testimony of the Ballew heirs and their transactions relative to the Leon yard, together with the admission of Stormfeltz in his deposition, fully justified the court's finding as to the ownership of those yards. The cumulative testimony of Frank H. Harrison that he saw the recapitulation or statement of inventory of the Leon yard in the administrator's office listing T. W. Ballew as the owner was not incompetent in view of the other testimony.

■ Appellants contend that the trial court erred in excluding the proffered testimony of the former judge of the probate court of Mercer County concerning conversations he had prior to entering his order of June 25, 1912. He testified that he had discussed the exchange of lumber company stock for lumber yards referred to in the order with Mr. Ben C. Hyde and with Mr. Frank Harrison and that no yards were discussed except those at Princeton and Jamesport, and that those two were the only two yards that he knew of. The trial court sustained objections to a further question, what, if anything, was said in the discussion as to the number of lumber yards that were to be exchanged. The application for the order permitting an exchange recited that only two yards were to be exchanged and the fact that the probate judge only inquired about or discussed those two yards referred to in the application appeared to the trial court to be irrelevant. Following the ruling on the objection to the question, the defendants offered to prove by the witness that both Mr. Hyde and Mr. Harrison advised the probate judge that the exchange of the stock for the two yards, plus the cash, would be for the best interests of the ward, and that they thought it should be made. The defendants did not at the time point out to the trial court that any attempt was being made to impeach any witness by this testimony and there appeared to the court to be no more than an effort to explain how the judge had come to make his order. Such explanation was immaterial in view of the plaintiff's position that the order had not been carried out by the guardian or any action under it reported to or confirmed by the probate

court. No sufficient foundation for impeachment is shown by the record and these rulings of the trial court occasioned no prejudicial error.

Very numerous assignments of error are based upon contentions concerning the form of the plaintiff's action and the limitations upon the recovery allowable thereon which it is said the judgment exceeds.

It is argued that the Leon and Seymour yards claimed to be a part of the estate of the ward's grandfather, T. W. Ballew, were located in the state of Iowa; that the ward's interest therein was subject to administration in the courts of Iowa, and not of Missouri; that the Missouri guardian had no extra-territorial powers; that the guardian's bondsmen were not liable for any maladministration of the ward's Iowa estate; that therefore the recovery against them on the bond on account of the guardian's conversion of the Iowa lumber yards was erroneous. It is also argued that the petition discloses a trade of the ward's lumber company stock by the guardian for four lumber yards as a unitary transaction. That the ward elected to ratify the transaction and accepted two of the lumber yards. That having made such election, the only right remaining to the ward was to pursue the other two yards and reclaim them, or, as they have been converted, to sue for their proceeds or their value. But as the other two yards are shown to be in Iowa and the guardian had no extra-territorial powers as guardian, it is argued that his bondsmen had no obligation respecting any estate of the ward outside of Missouri. And consequently, it is contended, there could be no recovery on account of the transfer of the Leon and Seymour yards to the guardian even though they were never accounted for to the ward.

Again it is argued that on account of the form of the petition and the fact that the ward has accepted and kept two of the lumber yards obtained in the exchange of stock for yards, he should be held to be estopped to make any claim or obtain any recovery on account of that part of his lumber company stock which is not represented by the two lumber yards which he accepted.

Again it is argued that the order of the probate court permitting the guardian to make an exchange of the ward's property was a final judgment which was a warrant of authority to the guardian to make the exchange. That the petition presents a suit to recover proceeds derived from the exchange and that the ward is estopped to question the probate court's order and is estopped to claim or obtain any recovery for conversion of his lumber company stock or any part thereof which was transferred by the guardian under the authority of that order.

In support of these several contentions many cases and statutory provisions are cited and elaborately discussed in the extended briefs which have been carefully considered. But we are not persuaded that the ward is so narrowly restricted or limited in this suit upon his guardian's bond as to prevent recovery under the facts here presented. The bond sued on is a statutory bond conditioned as the statute requires for the faithful performance of the guardian's duties. The guardian's duty is to take over the ward's property, administer it faithfully and account for it fully. The right of the ward to sue on the bond which we find the Missouri law accords him, is the right to sue for breach of duty by the guardian and to recover from the principal and the sureties on the bond to the full amount that the guardian is in duty bound to account for to his ward. The liability on the bond being controlled by the statutory condition for faithful performance of duty, the issues in the suit on the bond are the existence and extent of the duty and whether the duty has been breached.

With these considerations as to the nature of the plaintiff's suit in mind, we revert to the several contentions of the appellant. Although the Leon and Seymour lumber yards in Iowa might have been administered upon as part of the estate of T. W. Ballew, deceased, no such proceedings were had in regard to them. The heirs to whom they descended disposed of them by agreement among themselves as they could lawfully do (absent any creditors or adverse interests) with the same effect as though administration had been had. In re Acken, 144 Iowa 519, 123 N.W. 187, Ann.Cas.1912A, 1166; Johnston v. Johnston, 173 Mo. 91, 73 S.W. 202, 61 L.R.A. 166, 96 Am.St.Rep. 486. The order of the probate court of June 25, 1912, permitting the guardian to make an exchange of the ward's lumber company stock was not a command but an authorization merely. The exchange au-

thorized thereby was never made according to the terms of the order, no order of confirmation is involved, and no estoppel against the ward in this suit can be predicated upon the mere authorization of June 25, 1912. It was and continued to be the duty of the guardian to account to the ward for the 2,499 shares of lumber company stock received by the guardian on November 24, 1911. The ward accepted the guardian's accounting to the extent that he did account, that is, for the Jamesport and Princeton yards, but in respect to the other advantages and proceeds which accrued to the guardian, namely, the Leon and Seymour yards, the guardian did not account, but breached the duty he owed to the ward. The ward is not to be put into the position of one who has been defrauded in a contract which he has entered into, nor is he required to make restoration of that part of his estate which he has received as a prerequisite to suit on his guardian's bond for breaches of the guardian's duty to account for the whole of his estate. The Missouri statutes did not authorize the guardian to trade his ward's property for such business as a lumber yard and the trade was unlawful as to the ward. Nor does the Missouri law afford any sanction for the idea that a guardian may discharge the obligation of his bond by merely trading his ward's property for something he wants to take for himself in another state and which he does appropriate. If a guardian parts with his ward's property for such a purpose, it is a breach of the guardian's duty for which his sureties must respond in a suit against them on the bond. The duty of the guardian to account to the ward for his property was continuing. The guardian having disposed of a clearly distinguished part of the ward's lumber company stock for his own use and advantage without acknowledgment to the ward or accounting therefor, thereby committed a breach of his duty for which judgment was justly and properly to be awarded in the suit on the bond. The guardian made the transfer of the ward's lumber company stock in Missouri where it had been received by the guardian from the administrators of the estate of the ward's grandfather. The fact that the proceeds of the transfer which the guardian appropriated to himself in the transaction consisted of property in another state affords no defense to this suit on the guardian's bond.

## The Amendment to the First Cause of Action.

At the conclusion of the evidence the plaintiff was permitted to amend the first count of his pleading. As it stood, it was alleged that the guardian had wrongfully concealed from the probate court the true facts concerning the exchange of the ward's lumber company stock in part for the Leon and Seymour lumber yards for the purpose of enabling him to convert said Leon and Seymour yards and money in the sum of $6,644.78 to his own use and benefit. The amendment made it read "which facts said guardian intentionally * * * concealed * * * for the purpose of enabling him to convert said Leon and Seymour yards and said money and also said stock to the value of said yards and money, to his own use and benefit." It is extensively argued that the alleged abuse of discretion in allowing the amendment effected such a change of the cause of action as to present a new and inconsistent cause of action, and that the plaintiff was estopped to set up or to recover upon such new cause of action. Our determination of the nature of the plaintiff's suit as a suit upon the statutory bond in which the ward had the right to sue for breach of duty by the guardian and to recover from the principal and sureties to the full amount that the guardian is in duty bound to account for to his ward, compels the conclusion that there was no abuse of discretion in permitting the amendment to the pleading to be made. All of the acts and transactions of the guardian relied upon were set forth in the pleading in great detail and the allegations remained unaffected by the amendment. The proof sustained the allegations to the extent set forth in the findings of the court. The allowance of the amendment to include the purpose of the guardian described in the amendment was not an abuse of the judicial discretion to permit amendments and the ruling was not erroneous. The proofs showed the transfer of the lumber company stock to have been made in part for the personal advantage of the guardian to the exclusion of the ward and the breach of duty by the guardian was substantially the same breach set forth in the pleading before it was amended. See Henry v. Cleveland, C. C. & St. L. R., 332 Mo. 1072, 61 S.W.2d 340; Brown v. General Motors Corp., Mo.App., 95 S.W.2d 654; Lloyd's

Ins. Co. of America v. Moberly, 231 Mo. App. 920, 929, 930, 82 S.W.2d 139; Taber v. Universal Exploration Co., 8 Cir., 48 F.2d 1047, 1050, seq.

### Statute of Limitations.

Appellants contend that the statute of limitations barred these causes of action (I and III). As the suit is upon the guardian's bond, Missouri R.S.1929, Sec. 861, Mo.St.Ann. § 861, p. 1139, is applicable. It fixes ten years from the date the cause of action arises as the period within which an action at law must be begun. But it is firmly settled by the supreme court of Missouri that the ten year period does not begin to run against the action upon a guardian's bond until the guardian has made final settlement, and no valid or binding final settlement was ever made in this case. State ex rel. Yeoman v. Hoshaw, 86 Mo. 193; Nelson v. Barnett, 123 Mo. 564, 27 S.W. 520; State ex rel. Patterson v. Tittmann, 134 Mo. 162, 35 S.W. 579; State of Missouri ex rel. Stormfeltz v. Title Guaranty etc. Co., 8 Cir., 72 F.2d 595. The plea of the statute has been pressed particularly in connection with complaints made to the amending of the petition. But as we have found the amendments to these counts presented no new or different causes of action and the suit was commenced within the ten year period after the ward became of age and prior to any valid final settlement, these counts were plainly not barred by the statute of limitations.

### The Effect of Final Administration of the Estate of T. W. Ballew, Deceased.

Appellants contend that the orders in probate settling the administration of the estate of T. W. Ballew, deceased, precluded the recovery against the defendant herein. It is argued that as all of the ward's estate came to him from his grandfather, T. W. Ballew, the records of that estate are conclusive as to what property was included in the estate. That the Leon and Seymour lumber yards were not inventoried by the administrators as part of that estate and therefore the ward may not assert in this action that said yards were a part of the estate.

It appears that the estate of T. W. Ballew was free from debts except such as were promptly paid, and it was in the light of that fact that the heirs and sole persons in interest in the estate did as shown by the evidence take over and distribute among themselves and dispose of certain of the property (particularly the property referred to as "blind" yards) without submitting the property to the administration of the probate court. It appears to be well settled in Missouri that such procedure is lawful when there are no debts. Richardson v. Cole, 160 Mo. 372, 61 S.W. 182, 83 Am.St.Rep. 479; Johnston v. Johnston, 173 Mo. 91, 73 S.W. 202, 61 L.R.A. 166, 96 Am.St.Rep. 486; McCracken v. McCaslin, 50 Mo.App. 85; Painter v. Painter, 146 Mo.App. 598, 124 S.W. 561; Troll v. Landgraf, 183 Mo.App. 251, 168 S.W. 268; Bell v. Farmers', etc. Bank, 188 Mo.App. 383, 174 S.W. 196; cf. "Executors and Administrators," 23 C.J. 1002, Sec. 15. But the action here is not against the administrators of the Ballew estate who might avail themselves of an adjudication of plene administravit. Here the charge was and the proof established that certain consideration was conveyed to the guardian for the ward's lumber stock and the duty of the guardian to account resulted and was breached. No defense by the sureties could be predicated upon any alleged impropriety on the part of the heirs or administrators in failing to include in their probate proceedings the property which they disposed of by agreement among themselves.

### The Continuing Liability on the Bond.

Appellants assign error that the plaintiff failed to allege or prove that the bond sued on in this case remained in effect throughout the guardianship. On the trial of the case the defendants offered in evidence a journal entry of an order of the probate court of Mercer County, as follows: "Now on this 10th day of December, 1920, it is ordered by the court that the bond of Luther J. Stormfeltz as guardian and curator of the person and estate of Andrew J. Stormfeltz, a minor, Number of bond 0390610, said bond is signed by the American Surety Company of New York, beginning on the 6th day of November, 1921, be approved by this court."

The bond mentioned in the order was not introduced or offered in evidence and the reason for or circumstances under which the order was made are not disclosed in the record.

There are provisions in the Missouri statute under which complaint may be made against the insufficiency of the bond of an administrator or executor, and the probate

court, if it finds that the complaint is just, may require a new bond to be given and the giving and approval of such bond will operate to discharge the sureties upon the original bond. Mo.R.S.1929, Sec. 396, Secs. 27–31, Mo.St.Ann. §§ 396, 27–31, p. 253, and pp. 22, 23. The argument for appellants is that the court should have concluded from the journal entry of December 10, 1920, that the bond of the guardian sued on in this case had been cancelled and the sureties released after the date specified in the order. But the defendants did not raise such an issue by their pleadings. The plaintiff set out the guardian's bond in his petition and based his sixty-eight causes of action upon it, and although the defendants answered in great detail to each and all the charges they did not plead that the bond sued on had ever been cancelled or that the sureties had ever been released therefrom. The journal entry does not of itself prove that the bond had ever been cancelled, and in the absence of pleading and proof of such cancellation the assignment presents no ground to reverse the judgment on the bond.

### Declaration Concerning the Guardian's Receipt for $12,410.

Complaint is made of declaration of law numbered 13 to the effect that the receipt given by the guardian for the sum of $12,410 shifted to defendants the burden of disproving its recital that said sum was paid to the guardian for the ward. The declaration meant no more than to state the general law to the effect that a written receipt is prima facie evidence of payment as declared in the receipt. The court did not, however, rest its ultimate conclusion that the guardian had received the above sum of money for the ward merely upon the receipt shown in evidence. The consideration for which the money was paid to the guardian on the ward's account was established by the evidence and it was shown that the full amount was forthwith deposited in the personal bank account of the guardian and that it was never accounted for by him. The special findings of the court supported by the evidence fully justify the judgment for the principal sum on the third count.

### Testimony of Stormfeltz as to Transactions with Ballew and Hubacher.

Complaint is also made by appellants of declaration of law numbered 14 given by the court to the effect that "Stormfeltz is not competent to testify to transactions with deceased persons, including T. W. Ballew and C. A. Hubacher, both of whom are dead". It is not denied that the declaration was abstractly correct in view of R.S.Mo.1919, Sec. 5410, Mo.St. Ann. § 1723, p. 3994, but it is contended that the incompetency of the witness had been waived. The evidence and the Missouri cases are reviewed at length and although we are not persuaded that the questions put to the witness by the plaintiff resulted in waiver as claimed, we think it clear that no prejudicial error to justify reversal is involved. The record shows that the court received the testimony of the witness and considered and passed upon it. In declaration numbered 15, the court said: "Even if relator had waived the incompetency of Stormfeltz to testify to his alleged acquisition of the two Iowa yards from Ballew and Hubacher, deceased, the issue should be resolved against defendants on the weight of the evidence."

The court was the trier of the facts and its conclusion upon the weight of the evidence can not be disturbed.

### Summary as to Counts I and III.

On consideration of all of the objections urged against the findings and judgment upon the first and third counts, we conclude that the court rightly awarded judgment on the bond for the principal amounts found due on those counts. There remains the matter of interest to be included in the judgment on those counts.

The time when the guardian surrendered his ward's lumber company stock and appropriated to himself the Leon and Seymour yards was fixed by the evidence as July 5th, 1912—and the breach of duty on the part of the guardian was then completed. The ward's estate was then diminished at least to the value of the two yards which the court found to be $36,974. The court added to that amount interest compounded annually at the rate of 8 per cent per annum from that date to the date of the ward's majority, February 28, 1925, which produced the sum of $95,818.- 16, and to that sum simple interest thereon was added at six per cent per annum to the date of the judgment, making the total judgment on the count $166,755.40.

The appellants contend that the Missouri statute applicable to interest on this count is R.S.Mo.1929, Sec. 3267, Mo.St. Ann. § 3267, p. 3388, which reads: "The jury on the trial of any issue, or on any-

inquisition of damages, may, if they shall think fit, give damages, in the nature of interest, over and above the value of goods at the time of the conversion or seizure."

Appellants insist that because the trial court did not make any declaration that the allowance of interest was within the court's discretion, but simply found the interest to be due, there was no basis for the allowance of any interest and there was error. Wheeler v. McDonald, 77 Mo.App. 213, is relied on.

The appellee contends that the applicable statute is Mo.R.S.1929, Sec. 418, Mo. St.Ann. § 418, p. 264: "Guardians and curators shall, unless the money be invested in improving the real estate of the wards as hereinafter provided, loan the money of their wards at the highest legal rate of interest that can be obtained, on prime real estate security, or invest it in bonds of the United States, or of the state of Missouri, or of the federal farm loan bank except where the estate is less than three hundred dollars, in which case good personal security may be taken, and shall account for all such interest received, which shall be charged in their annual settlements; the interest in such cases shall be paid annually, and if not then paid shall become a part of the principal and bear interest at the same rate; and it shall be the duty of the court to require every guardian and curator to make a report at every annual settlement of the disposition made by the guardian or curator of the money belonging to the ward intrusted to him, and if it appear that such money is loaned out, then he shall state the name of the person to whom loaned, the description of the real estate security, and where situated, and its value, which report shall be sworn to by said guardian or curator and filed in the court; * * * and if such money has not been loaned out, the guardian or curator shall state such fact and the reasons, which report shall be sworn to, and shall, unless the money be invested in improving the real estate of the wards as hereinafter provided, state that such guardian or curator has been unable to make loan after diligent effort to do so, and if any guardian or curator shall refuse or neglect to make such report at the time aforesaid, or shall make a false report thereof, he and his sureties shall be liable on their bond for all loss or damage to such ward occasioned by reason of such neglect or refusal so to report, or by the making of such false report, and such guardian and curator may, on account thereof, be removed from his trust in the discretion of said court. * * * "

The following cases are cited by appellee to justify the allowance of interest as provided in the foregoing section: Finnell v. Kellogg, 194 Mo.App. 342, 186 S. W. 1169; State ex rel. Deckard v. Macom, Mo.App., 186 S.W. 1157; Cross v. Rubey, Mo.App., 206 S.W. 413; Berry v. Berry, Mo.App., 218 S.W. 691; Mills v. Smith, Mo.App., 92 S.W.2d 939; Caskey v. Caskey, Mo.App., 116 S.W.2d 527.

Study of the Missouri decisions governing the allowance and computation of interest in such an action as is here presented has not persuaded that an absolute rule applicable to all situations has been established. As was said in Cruce v. Cruce, 81 Mo. 676, loc. cit. 688, "every case must be determined according to the facts and circumstances peculiar to it." In Scudder v. Ames, 89 Mo. 496, 508, 14 S.W. 525, only 6 per cent simple interest was allowed on a judgment awarded for money that had been secretly withheld from the estate. In very early days when high rates were general, interest on such judgment was computed at a rate as high as ten per cent. In re Davis, 62 Mo. 450; Williams v. Petticrew's Heirs, 62 Mo. 460. The testimony in this case is clear that during the period here involved no such rate of interest was obtainable. The proof showed six per cent to be within general and customary usage of borrowers and lenders.

There is no showing that the guardian had in fact enriched himself by the transaction to any such extent as the interest compounded would amount to. He has not joined in the appeal, and it is evident that the burden of the judgment falls upon the sureties. Although no statute of limitations has barred recovery, we should not ignore the long lapse of time that has intervened since the transactions and the harsh result of compounding interest over so long a period.

We do not sustain the contention of appellants that such interest was allowable only in the discretion of the trial court as "upon an inquisition of damages by the jury". The recovery being rested upon the breach of the guardian's duty to preserve the ward's property and the value being fixed by the evidence, the plaintiff was entitled as of right to the interest on

such value at six per cent. We conclude that in view of the circumstances of the transaction, whereby the ward's stock was disposed of in part for the Leon and Seymour yards, the court should not have added compound interest upon its judgment for $36,974.27, but that simple interest only at the rate of six per cent per annum from July 5, 1912, to the date of judgment would best answer the ends of justice and conform to Missouri law. Denny v. Guyton, 331 Mo. 1115, 1154, 57 S.W.2d 415, loc. cit. 432; Sanguinett v. Webster, 153 Mo. 343, loc. cit. 373, 374, 54 S.W. 563; Bobb v. Bobb, 89 Mo. 411, 4 S.W. 511; Cruce v. Cruce, 81 Mo. 676; Wolfort v. Reilly, 133 Mo. 463, 468, 34 S.W. 847; Enright v. Sedalia Trust Co., 323 Mo. 1043, 20 S.W.2d 517; see McCune's Estate v. Daniel, Mo.Sup., 76 S.W.2d 403, 407; Mills v. Smith, Mo.App., 92 S.W.2d 939, 943, 944.

The interest upon the item of $12,410 for which the plaintiff had judgment on the third count presents a somewhat different question. There the proof showed that the guardian received the money on July 5, 1912, and forthwith put it in the bank to his own credit. As to the money so received, he was clearly within the provisions of Mo.R.S.1929, Sec. 418, and was chargeable with compound interest. But we conclude that under the evidence the rate of eight per cent used in the computation was higher than the obtainable rate and that no higher rate than six per cent is sustainable. The judgment as to the third count should therefore be modified by computing the interest at six per cent compounded as provided in the judgment until the majority of the ward and with simple interest added to such amount at six per cent to the date of the judgment.

### Claimed Separate Defense.

The appellant American Surety Company contends that it has a separate defense against the part of the plaintiff's suit based upon the guardian's derelictions of duty which occurred prior to April 28, 1914 (the transactions concerning the Leon and Seymour yards were in 1912), and that the court erred in rendering the joint judgment against both sureties on the first and third counts of the petition. The contention is rested on the fact that during the course of the trial it was stipulated between the parties that in the month of November, 1913, a contract was entered into by and between the defendants Title Guaranty and Surety Company, and American Surety Company, entitled Reinsurance Agreement, in which contract it was agreed as follows:

### "Reinsurance Agreement.

"In Consideration of the payment to it of seventy per cent (70%) of the unearned premium (calculated in accordance with the rules of the New York Insurance Department) on each of the obligations specified in the Schedules signed by the parties hereto and annexed after being dated, accepted and approved, and of the right to collect and receive the renewal premiums to become due from the principal therein named on each of such obligations, the American Surety Company of New York (hereinafter called the 'American') assumes all the liabilities of The Title Guaranty and Surety Company (hereinafter called the 'Title') under each of the obligations specified in such Schedules, for any default of the principal therein named occurring after the written approval and acceptance of the Schedule wherein such obligations shall be specified, and agrees to pay to the Title, its successors and assigns, any sum which the Title shall be liable to pay by reason of such default; Provided, however, that the liability of the American upon or by reason of any such obligation or default, shall not, under any circumstances, exceed the amount of such obligation, as set forth in the Schedule wherein such obligation is specified; and the American agrees to pay to the Title the reasonable expense of settling or defending any claim made under such obligation, if requested by the American to defend or settle such claim.

"The Title authorizes the American to exercise, in its name or otherwise, all the rights of the Title in connection with each of such obligations so accepted, and agrees that when it receives any communication relative to such obligation, it will immediately forward the same, by United States mail, to the American at its office in the City of New York and the Title shall deliver to the American all of its books, files and records concerning such obligation; And also that in the event of the payment by the American to or for the Title of any sum for which the latter shall be liable, the American shall immediately become subrogated to all the rights of the Title; and also so that in the event of the Title holding collateral or other security against loss on any such obligation or for the payment of premium therefor, that such collateral or other security shall be held intact and de-

posited with the American for the purpose for which the Title holds the same, and also that if the American shall cause the cancellation of any of the obligations so accepted under circumstances justifying the return to the principal or indemnitors thereon of all or any part of the unearned premium therefor, then it, the Title, shall pay to the American all the unearned premium which is in excess of the premium by the American received from the Title therefor, and if the amount to be returned is less than the amount paid the American therefor, the Title will return thirty per cent (30%) of the portion of the unearned premium thus to be returned; And also the Title desiring that the American substitute in each instance where feasible its obligation in lieu of that of the Title in substantially similar form, but with provisions to the effect that the liability of the American shall date from the date of the obligation of the Title (all to the end that the liability of the Title to the obligee named in such obligation may be discharged and such obligation cancelled), and as such substitution in that manner may make the American liable for some default of such principal which occurred before such substitution, the Title shall pay to the American, on demand, such sum which by reason of any one of such obligations the American shall become liable to pay because of the default of the principal thereunder which occurred prior to the date of the approval and acceptance of the Schedule wherein such obligation shall be specified, or if not so specified in such Schedule, then prior to the date of such substitution, the payment so made by reason of any one of such obligations, however, not to exceed the penalty named in such obligation so by the Title executed.

"In Witness Whereof, the parties hereto have caused these presents to be signed, the American Surety Company of New York by its Vice-President, attested by its Assistant Secretary, and The Title Guaranty and Surety Company by its President, attested by its Secretary, this the —— day of November, 1913."

The Schedule annexed to the contract included the bond sued on and bore date April 28, 1914.

It is contended that the American Surety Company assumed no liability on the guardian's bond in, suit for any breach occurring prior to the Schedule date. It assumed "all the liabilities" and became the primary obligor as between itself and the Title Guaranty and Surety Company and became entitled to receive and did receive the premiums payable on the bond. If the plaintiff's procedure had been in the form of an accounting at the time of the majority of the ward and a judgment in probate court to turn over to the ward all of his property and the proceeds thereof which had accrued to the guardian during the ward's minority, there would have been no question but that the American would have been obliged to respond to the ward under its reinsurance contract jointly with the surety signatory on the bond. But the narrow point now contended for is that the suit and the joint judgment was for a conversion of the ward's property by the guardian and that the date of such conversion is prior to the schedule date.

The cases cited by the appellant American indicate that in a suit between the American and the Title Guaranty to determine their respective rights, if such rights are in fact and in law controlled entirely by the contract above set forth, it may be held that the amount of the joint judgment herein on the first and third count in the form in which it was rendered should be' chargeable to the Title rather than to the American. See National Surety Corporation v. Ellison, 8 Cir., 88 F.2d 399. But our question is whether the respective obligations of the sureties between themselves as they might result from the form of the action and in the form of the corresponding judgment, is subject to review by this court on the record before us.

It is observed that a bond conditioned for the faithful performance of the duties of a minor's guardian covers the continuing duties arising throughout the ward's minority and is essentially a continuing obligation which has throughout particular relation to the accounting period at the coming of age of the ward, and whoever becomes surety upon such a bond is bound in respect to all the duties that may devolve upon the guardian and breaches thereof for which accounting must be made at the settlement period.

In this case the ward pleaded:

"(5) Said Title Guaranty and Surety Company executed said bond as surety for said guardian in consideration of a premium of $400.00 then paid to it by said guardian, and his agreement to pay to said company the further premium of $400.00 annually thereafter until relator should become

21 years of age. Subsequently, and on or about November 2, 1912, said guardian paid to said Title Guaranty and Surety Company an additional $400.00 premium for the year commencing on the date last aforesaid.

"(6) On or about the 8th day of November, 1913, said Title Guaranty and Surety Company and the defendant American Surety Company made and entered into a contract with each other, by the terms of which the American Surety Company assumed all liabilities of the Title Guaranty and Surety Company under said bond for any default of said guardian and guaranteed payment of and agreed to hold it harmless as against all liability on said bond, in consideration of which said Title Guaranty and Surety Company transferred to said American Surety Company the right to receive and retain all unmatured premiums on said bond, and so notified said guardian, who thereafter, at the joint direction of said companies, paid to said American Surety Company all premiums on said bond until plaintiff attained majority."

Although the Title Guaranty and the American Surety Companies filed very extended answer and several amended answers and amendments to answers, all of their pleadings were joint pleadings and all of the defenses alleged were joint defenses. The American never at any time throughout the years of litigation asserted or alleged that it had any special defense to the action separate or distinct from the joint defenses which were presented jointly by itself and the Title Guaranty Company. It made no request of the court for any separate finding of fact in favor of itself or against the Title company. It made no request for any special conclusion of law in favor of itself or against the Title company. The motion for new trial was a joint motion and the appeal was taken jointly after severance jointly prayed for and allowed against the guardian, Luther J. Stormfeltz. The contention that the particular form of the ward's action gave rise to a special defense for the American Company is raised for the first time in this court some seven years after the suit was brought.

We think the decision of the Supreme Court of Missouri in State ex rel. Gordon v. Kennedy, 163 Mo. 510, 63 S.W. 678, firmly settles that the asserted defense is not now available to the appellant American Surety Company.

The Conversion Counts.

In pleading his causes of action on the so-called conversion counts numbered six to sixty-nine, the ward repeated the allegations of his first count and alleged that on or about certain dates specified in each separately numbered count, the defendant guardian wrongfully and fraudulently caused and permitted amounts of money specified in each count derived from the operation by the guardian of the Princeton and Jamesport yards to be diverted from the ward. The ward prayed that the purported judgment on final settlement in the probate court be held for naught and that he have and recover judgment on the guardian's bond for the amount in each count charged to have been converted with interest at 8 per cent compounded.

Although the suit was commenced on May 1, 1931, the several pleadings of the defendants thereafter filed presented no claim that the guardian had made any advancements to his ward's estate or that he was entitled to anything by way of set off against the amounts sued for until they filed the amended answer in March, 1936, on which the case was tried. They then alleged that the guardian had caused separate correct accounts of the operations of each of said two lumber yards to be kept; that each yard had been managed as an independent separate unit, and that complete and full accounting as to the two yards and payment of the whole estate had been made to the ward at his majority. They also alleged that the guardian had at various times advanced out of his individual funds to the estate of his ward and to one or the other of the two lumber yards of the ward's estate, various sums set out by items which aggregated $171,152.87, and that if any of the amounts sued for in these conversion counts were paid to or received by the guardian (which was denied), all thereof were repayments to the guardian of his advancements and that the defendants were entitled to have the advancements set off against the ward's claims, and that the ward was not entitled to recover on any of the conversion counts.

Upon the evidence relating to the conversion counts the court adopted and made the findings requested by the plaintiff. As to the sequential order of the findings, the court observed that in all of the annual reports filed by the guardian in the probate court year by year, and in the final report at the ward's majority, the guardian had reported upon the Princeton yard as one separate matter and upon the Jamesport yard as another, and upon the remainder of the estate as another.

## The Cash Fund.

The first division of the court's findings relative to the conversion counts was accordingly made with more particular reference to that part of the ward's estate which had been referred to as the cash fund of the estate and which had been reported by the guardian separately from the two lumber yards. At the majority of the ward, the guardian had turned over the net proceeds of the cash fund after deducting expenses, maintenance of the ward and costs therefrom as a distinct and separate unit of his accounting. The court found:

"As to Counts VI Et Seq.

"The three funds of Relator's Guardianship Estate.

"As Stormfeltz had traded off plaintiff's lumber yard stock in the summer of 1912, his first annual (report to the County court), which was not filed until spring of the following year (3/8-1913), does not list the stock itself. Instead, it lists the Jamesport and Princeton lumber yards. In the first annual and all subsequent ones, Stormfeltz treated relator's estate as if it consisted of three parts. No. 1, the Princeton yard. No. 2, the Jamesport yard. No. 3, the remainder of the estate, which included cash distributions from the Ballew assets and securities purchased therewith and a transfer from No. 2 to No. 3, of $2,000.00, which is the subject of Count 7. For convenience this residuary fund No. 3, will be called the 'cash fund'.

"Count 7.

"Jamesport $2,000.00

"Stormfeltz had two bank accounts in his name as guardian for the cash fund. One of them was in the Commerce Trust Company in Kansas City. The other was in the Farmers Bank at Princeton. Both of these bank accounts were under joint control of Stormfeltz and his sureties. He also kept some of the guardianship funds in an account that was not under joint control, and which was in his personal name in the bank of Mercer County, at Princeton. This account was opened October 3, 1912, and closed November 6, 1914, by transfer of its $213.43 balance into the personal account of Stormfeltz in the Farmers. The parties have stipulated that this account in the Bank of Mercer County, though it was in the name of Stormfeltz and not under joint control, may nevertheless be treated as being a guardianship account. From the cash in these three accounts he invested in or made various real estate loans, and

also purchased liberty bonds. When he collected the interest on or principal of any such loan or security, he would not immediately place the money so received by him in one of his accounts as guardian where it would again become subject to joint control. Instead, he would deposit it in one of his own personal bank accounts, thus commingling it with whatever personal funds such account might at the time contain. Then from the personal account he would make disbursements for his ward's estate, and ultimately return what was left of the money to one of the joint control accounts that he kept as guardian. For this commingling of the funds of the ward's estate with his own, he has given this court no explanation, reason or excuse whatever.

"Although relator asks no recovery by reason of the commingling above mentioned, the fact that it occurred is one of the reasons why the bank accounts kept in the name of Stormfeltz as guardian and his transactions through such accounts are not alone sufficient to show the true state of his account with the cash fund.

"In his annual settlements the guardian debited himself in the cash fund with the items which came to him for his ward, by way of distribution from the administrators of the Ballew estate, from the ward's interest in the proceeds of the sale of lands left by T. W. Ballew, and $822.68 from the estate of Metta Ballew, a great aunt of Relator, which $822.68 will in subsequent remarks be treated as though it had come from the estate of T. W. Ballew. These amounts total $52,965.88, which of course, does not include interest received on loans and investments of relator's estate.

"The amount of interest earned by the cash fund and collected by Stormfeltz, including all that accrued on bank deposits and real estate loans and liberty bonds, during the more than twelve-year period of the guardianship, total $34,720.28. This item of interest, added to the principal of $52,965.88 in the cash fund, makes a total debit of $87,686.16.

"The total of $87,686.16 debited to the guardian in the cash fund represents only money that he admits came to his ward direct from the Ballew estate. It does not include an item of $2,000.00, which is the subject of Count 7, and which arose in the following manner:

"On 11/10-1912, Hollister wrote to Mr. Terry, who was then manager of the yard

at Jamesport, telling him to obtain a draft for $2,000.00 on or before December 10, 1913, and charge it as a yard expense and mail the draft to Princeton.

"Acting in accordance with these instructions, Terry on 12/10-1912, took $2,000.00 cash belonging to the Jamesport yard, and with it bought a draft in that sum, which he sent to Hollister at Princeton. Terry debited the $2,000.00 to expense on the books of the Jamesport yard.

"Those books do not show that there was any such item of expense for which the yard could have been liable. The $2,000.00 did not go for expenses. The withdrawal constituted a deduction from the capital investment of the yard. However, when the draft reached Hollister at Princeton, it was deposited in the guardianship account in the Bank of Mercer County, and became a part of the cash fund. Hence the guardian is liable for this $2,000.00 as a part of the cash fund in addition to the $87,686.16.

"Defendants concede in their 'Memorandum Answer to Plaintiff's Reply Brief' page 82, that the $2,000.00 should be added to the $87,686.16 debit against the guardian in the cash fund. Such addition raises the total debit to the sum of $89,686.16.

"Turning now to the credits against the cash fund, these consist of two items. One is the amount of cash and securities which the guardian turned over to the ward in his last settlement on 3/26-1925, which amounted to $50,594.55.

"The other consists of the administration expenses and personal expenses of the ward paid by the guardian during the period of the guardianship, which amounts to the sum of $39,389.72. These two sums aggregate $89,984.27. Hence the account of the guardian with the cash fund tabulates as follows, the factors used being those stated by defendants in their Memorandum, pp. 81-82:

| Distribution from administered and unadministered funds of T. W. B. estate, and estate of Metta Ballew, | | Administration expenses, Alleged advancements to ward's estate and expenditures for ward | |
|---|---|---|---|
| | $52,965.88 | | $39,389.72 |
| Interest earned | 34,720.28 | By guardian to relator on | |
| Count 7, J'port | 2,000.00 | 3/26-1925 | 50,594.55 |
| Excess | 298.11 | | |
| | | | $89,984.27 |
| | $89,984.27 | | |

"From the foregoing table it appears that Stormfeltz has accounted, in the cash fund, for the $2,000.00 item which is the subject of Count 7; hence Relator is not entitled to recover upon that Count.

"As to the above mentioned credit in the cash fund of $298.11, which arose by payments to said fund made by Stormfeltz from his personal resources beyond what he owed to such fund. It is one thing to credit a guardian for re-payment of what he owes to the ward's estate, and quite a different thing to require the ward to repay to the guardian any amount the latter may have advanced beyond what he owes. A guardian has the right, under authorization of the probate court, to obligate the ward's estate for repayment under the provisions of Mo.R.S.1929, Secs. 402, 403, Mo.St.Ann. §§ 402, 403 p. 256. But these Statutes do not authorize a guardian to obligate a ward's estate to repay advancements not necessary to the support of the ward according to the ward's means, or not necessary for the discharge of any mortgage indebtedness against the ward's realty.

"In this instance there was no realty that belonged to the estate, except that of the Jamesport and Princeton yards, on which there was no incumbrance; and so far as support, maintenance, etc., are concerned, there were thousands of dollars of unused money to the credit of the ward's estate lying in banks. Under such conditions there was nothing that warranted any advancements to the estate that would require repayment.

"None of the advancements by Stormfeltz to the cash fund were authorized by the probate court, and no conditions existed which would have warranted the court in granting any such authorization. All of the advancements by the guardian, were made as his voluntary act, and with no promise of repayment, express or implied by law.

"Neither a guardian nor any other trustee can by voluntary transfer of his private funds to the beneficiary's estate, obligate the latter to repay the amount of such advancements. Otherwise, such guardian or trustee could put his ward in debt to himself to any extent up to the very limit of his ability to make advancements without let or hindrance, and then demand repayment at will. Such conduct might conceivably result in ultimately rendering the ward insolvent. It is not tolerated by the law.

"Moreover, Stormfeltz claimed no credit in his annuals, including his so-

called final settlement of 3/26-1925, for said $298.11 excess, or any sum wherein it is included. The first credit he ever claimed because of voluntary payments made by him to the ward's estate was in the Second Amended Answer of defendants in this action, which was not filed until 3/6-1936. Any claim on the part of the guardian for repayment of the $298.11 has long been barred by the Statute of Limitations. In according to Stormfeltz a credit for the $2,000.00 represented by Count 7, the court is awarding him all the credit to which he is entitled, by reason of the cash fund. Said $2,000.00 represented by Count 7, is the only abstraction from either the Jamesport or the Princeton yard which was deposited in any guardianship bank account, and for which Stormfeltz is accountable in the cash fund. All other abstractions from the two yards constituted depletions of one or the other of the yard funds.

"The foregoing table is confined to the cash fund. None of its items contain any sum represented by any of the counts in plaintiff's petition except Count 7. Aside from that, Stormfeltz has not accounted for any of the amounts claimed in any count of the petition."

Continuing the Conversion Counts.

The appellants have complained of the action of the court in finding that the part of the estate of the ward outside of the two lumber yard properties (the cash fund) was accounted for as indicated by the court in the above findings. They insist that other factors and elements were necessary to be taken into account in order to settle the rights of the guardian in respect to the cash fund of the estate and that the court erred in refusing to adopt the "compilation and summary" of the account of the guardianship (outside of Counts I and III) prepared by defendants' expert Rader and introduced in evidence by them.

The evidence showed plainly what the several items of cash money were that went into the cash fund of the estate. There was no dispute as to the amount of interest earned and the court adopted the request of the defendants in finding the amount of interest earnings. The amount of charges for expenses, disbursements for the ward and costs of administration was also beyond dispute and the court adopted that amount from defendants' accountants.

The court accordingly made its findings in regard to the cash fund of the estate by comparison of the amount of cash that went to the guardian with the amount that he turned over to the ward at majority. The interest earnings were added and the charges were deducted and it was found that the amount paid the ward corresponded almost exactly with the amount for which the guardian was chargeable in respect to the cash fund.

The defendants insisted that some of the securities that had gone to make up the fund had come from payments made therefor by the guardian out of his own pocket and from moneys the guardian had drawn out of the ward's lumber yard businesses. The court found as to one item (count 7) that $2,000 had been taken out of the ward's Jamesport yard and had been put in the cash fund and the court gave the guardian credit therefor. But the court found that item to be the only item for which the guardian was accountable in the cash fund and that all of the other abstractions made by the guardian from the ward's lumber yards constituted depletion of the funds of one or the other yard and that the cash fund turned over to the ward did not contain any sum taken from either of the yards. These findings were sustained by the evidence.

Continuing the Conversion Counts.

Having found that the part of the ward's estate referred to as the cash fund had been accounted for by the guardian and that substantially the true amount thereof, after allowing all just and proper deductions, had been turned over by the guardian to the ward at his majority, the trial court then proceeded to the plaintiff's charges that the guardian had converted various sums of money out of the funds of the two lumber yards which he operated for the ward. The court found generally as to the claimed conversions from the funds of the two lumber yards:

"The Lumber Yard Funds.

"Stormfeltz, after acquisition of the Princeton and Jamesport yards, did not actively participate in their operation. He spent most of his time in Kansas City. He employed E. Hollister to operate the Princeton yard, and to act as general manager thereof and also of the Jamesport and of the Leon and Seymour yards. Hollister died in 1933. His deposition was not taken in this action and no testimony by him is in the record. However, it

clearly appears from the evidence that Hollister attended to the buying of all merchandise and all operations of the four yards which Stormfeltz operated under the name of Stormfeltz Lumber Company. Hollister supervised their books and banking accounts, and financial affairs, and his endorsement of any check issued by the Stormfeltz Lumber Company was recognized as valid by the banks whether such check was payable to Stormfeltz Lumber Company or to E. Hollister, or to Luther Stormfeltz. Hollister also attended to the personal business and bank accounts of defendant Stormfeltz at Princeton, including the making of deposits therein, and he prepared some of the annual settlements filed in the probate court by the guardian, and he obtained orders of the probate court for loans and expenses. In general, Hollister relieved Stormfeltz of nearly all care and attention to relator's estate. Stormfeltz admits that all Hollister did in the respects aforesaid was within the scope of Hollister's authority as granted to him by Stormfeltz.

"All of the items for which relator makes claim in Counts VI et seq., of his petition, were either paid out by or at the direction of Hollister. Also the entries were made in the yard journals by or at the direction of Hollister, whereby such items were debited to defendant Stormfeltz. The latter testified that he would from time to time visit the yards and inspect the books and accounts, and that he was always present at the end of each fiscal year when the annual inventories were taken and the recaps made up. Stormfeltz knew of the charges against him on the books of the Jamesport and Princeton yards, for various sums of money for which relator, his former ward, makes claim in this action.

"The Princeton and Jamesport yards each had its own set of journals and ledgers and its own separate bank accounts. The bank accounts of the Princeton yard were kept in Princeton banks, and those of the Jamesport yard in Jamesport banks."

### The Jamesport Yard.

Turning now to the Jamesport yard. The plaintiff claimed that the guardian received the Jamesport yard free of indebtedness in the trade of July 5, 1912, and became chargeable to the ward therefor at the valuation of $15,227.39 shown upon the books of the yard. That he operated the yard during the remaining years of the plaintiff's minority (about 13 years), and the operation produced net profits which belonged to the plaintiff. That the value of the yard plus the profits earned by the yard, for which the guardian should have accounted to the ward at majority, was the sum of $52,304.54. But the value at which the guardian did account and at which he turned the yard over to the ward, was only $43,408.52. The difference amounted to $8,896.02, and the plaintiff claimed a shortage on account of the profits earned by the Jamesport lumber yard in that sum. In the four conversion counts, numbered 11, 15, 16 and 19, the plaintiff set out the times when and the amounts in which he alleged the guardian had converted the several sums out of the profits of the Jamesport yard, which together equalled the claimed shortage of $8,896.02. The findings of the court upon the four counts (to be read in connection with all findings) were as follows:

"The Jamesport Yard Fund.

"The Jamesport yard was originally managed by a Mr. Terry; but in 1913 Stormfeltz placed it in charge of O. J. Somerville who, under Hollister's management, continued thenceforth as local manager to operate the Jamesport yard throughout the remaining period of relator's minority.

"Although Stormfeltz did not commingle any of his own funds with the funds of the Jamesport yard, yet the following items were abstracted from the Jamesport yard during the minority of the relator and converted by the guardian to his own use.

"Count 11.

"The records of the Jamesport yard show that for the fiscal year ending December 22, 1915, that yard made a profit of $4,796.02. On that date the journals of the Jamesport yard show that the investment account was debited $4,796.02 by checks to 'Stormfeltz Lumber Company'. Two checks were issued on that date by the Jamesport yard on its account, both in favor of E. Hollister. One of these was for $3,512.25; the other for $1,283.75, which total $4,796.00. The cash fund of the relator was not augmented by the removal of this sum of money from the Jamesport yard, nor was the Princeton yard account augmented by such withdrawal. The guardian did not charge himself with this sum as additional inven-

tory nor did he report to the probate court that this 1915 profit of the Jamesport yard had been withdrawn. The evidence clearly demonstrates a loss to relator in the sum of $4,796.00. In this count plaintiff originally prayed for recovery of $3,512.-25, but has moved to amend this Count to pray for a recovery of $4,796.00 to conform to proof. Leave to so amend is given, and he should have judgment as so prayed.

"Count 15.

"The records of the Jamesport yard show that on January 17, 1917, a check for $1,000.00 was issued in favor of E. Hollister and the amount of said check was deducted from the capital investment account of the Jamesport yard. The guardian did not advise the probate court of such fact nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented by the amount of this withdrawal from Jamesport. The evidence clearly demonstrates a wrongful taking of $1,000.00 from the relator's estate. Thereon relator is entitled to judgment.

"Count 16.

"The records of the Jamesport yard show that on February 2, 1917, a check for $1,000.00 was issued in favor of E. Hollister and the amount of said check was deducted from the capital investment account of the Jamesport yard. The guardian did not advise the probate court of such fact nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented by the amount of this withdrawal from Jamesport. The evidence clearly demonstrates a wrongful taking of $1,000.00 from the relator's estate. Thereon relator is entitled to judgment.

"Count 19.

"The records of the Jamesport yard show that on January 13, 1919, a check for $2,100.00 was issued in favor of 'Stormfeltz Lumber Company' in payment of a false liability which had been set up against the yard on the recap of the yard dated December 23, 1918. The check bears the following indorsements. 'Stormfeltz Lumber Company to Commerce Trust Company, L. J. Stormfeltz'. It was deposited in the personal account of defendant Stormfeltz in the Commerce Trust Company at Kansas City.

"The guardian did not report the transaction to the probate court, nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard were augmented through this withdrawal of $2,100.00 from Jamesport. The evidence clearly demonstrates the wrongful taking of $2,100.00 from his ward's estate by the defendant Stormfeltz. Thereon relator is entitled to judgment."

The appellants assert (1) that the court erred in permitting the plaintiff to make the amendment to the pleadings as to Count 11; (2) that the facts found are insufficient to sustain the judgment upon either of these four counts, and (3) that there was no substantial evidence to support the findings on which the judgment for the plaintiff in respect to them was rested.

■■ (1) We find no error on the part of the court in permitting the amendment to be made to the pleading of Count 11 at the time of trial. The amendment merely conformed the pleading to the uncontradicted proof that the amount of the profits of the yard shown on its books for the year ending December 22, 1915, amounted to $4,796.02, and that the whole thereof was withdrawn from the funds of the yard by checks to the guardian's agent. No statute of limitations had barred the plaintiff's right to sue for the amount because the ward has never yet had final settlement with his guardian as contemplated by the Missouri statutes. (2) Nor do we find any lack of clarity or sufficiency of fact finding to support the judgment on these counts. The court found that each of the items of the 11th, 15th, 16th and 19th counts "was abstracted from the Jamesport yard during the minority of the relator and converted by the guardian to his own use", and that finding taken with the details and the steps by which the conversions were effected as set out by the court was sufficient.

■ (3) The evidence was sufficient to sustain the court's finding that the sum of $4,796.02 was wrongfully withdrawn from the Jamesport yard as charged in the 11th count. The books of the yard show the profit earned by the yard during the period. The manager of the yard testified that checks for the profits were sent to the guardian's agent and the accountants for defendants admitted that no accounting for the money had ever been made by the guardian.

As to counts 15 and 16, the books of the Jamesport yard show that the total sum of

$2,000 was abstracted out of the yard funds and debited against the yard investment as found by the court. As to count 19, it is clearly shown by the evidence that the full amount of $2,100 was wrongfully taken out of the yard funds and the amount entered as a liability of the yard to reduce the capital investment for which the guardian was chargeable.

Examination of the evidence relating to these four items leaves no doubt that the items were wrongfully converted to his own use by the guardian and that the fact of the conversions was concealed from the probate court by the guardian's system of reporting to that court concerning the ward's Jamesport yard. Each of the reports purported to show the amount of the ward's capital investment in the yard at the reporting period. The guardian withdrew the profits from the yard to the extent found in these counts and in his reports he charged himself only with the amount of the capital investment that was left in the Jamesport yard after the conversions had been made.

As to Count 19, the defendants asserted that they were entitled to an offset as follows: They opposed the finding of the court that the cash fund balance due the ward at his majority amounted to $50,984.27. They claimed that the guardian in reporting the balance in the cash fund in that sum to the probate court, and in turning that sum over to the ward, had failed to take credits to which he was entitled in respect to the cash fund, and that he had reported and ultimately turned over to the ward an excess of $9,495.18 more than the ward was entitled to receive out of that fund. They claimed that a credit should be given the guardian in that amount and that the $2,100 converted from the funds of the Jamesport yard (Count 19) should be held to be offset by the credit due the guardian in the cash fund. The defendants relied upon a compilation of accounts of the guardianship made by their expert accountant, John W. Rader, which purported to show that the claimed credit in the cash fund was due the guardian. They requested the court to find in accord with Mr. Rader's compilation and the court refused to do so. The appellants insist their demonstration was mathematical and that there was error of law.

Mr. Rader is a skilled and experienced public accountant and there was no dispute about the correctness of any of his mathematical computations. But the evidence was that the guardian's books and records of the lumber yards and the reports to the probate court had always been made out with bookkeeping care and skill throughout the years. The real question was whether the theory upon which Mr. Rader reconstructed his accounting of the cash fund of the estate and produced the large credit to the guardian was more accurate than the guardian's own accounting of the cash fund upon which he had reported himself to be chargeable with and had turned over to the ward the sum of $50,984.27.

It appears that Mr. Rader had Mr. Stormfeltz's bank records, bank ledger sheets, deposit slips, checks and check stubs, inventories in the probate court settlements, probate court orders and all the other probate court records, and that his reconstruction of the account of the guardianship was an attempted reconciliation of the bank accounts with the guardianship reports. Although Mr. Stormfeltz testified that he had kept a ledger account of everything that had transpired as guardian, no such ledger account of his transactions with reference to the cash fund was found amongst the very great amount of records preserved. The reconstructed account by Mr. Rader covers thirty sheets of figures and bears witness to toilsome labor on his part, but falls short of demonstrating the guardian's right to credit for the claimed over-payment to the ward in the cash fund.

The cash that came to the guardian for which he had to account in the cash fund is shown in the Rader account in substantially the same amount that the plaintiff claimed the guardian had received. The only other elements necessary to full accounting upon the cash fund were the interest earnings and the proper deductions. Mr. Rader was compelled to estimate what the earnings had amounted to because he could not trace them identically. He made a very intelligent close estimate however, and the court accepted the estimate. As to deductions, Mr. Rader was unable to identify withdrawals from the bank accounts with payments for disbursements and expenses. He followed the records and orders of the probate court as to the amounts of such disbursements and expenses and the district court adopted the figures arrived at by Mr. Rader. On the basis of the amount received, plus earnings and minus the disbursements, there was substantially no credit for the guardian

over and above the amount in the cash fund he accounted for to the ward at majority.

Mr. Rader's reconstruction brought large figures into the accounting and added elements of uncertainty because his accounting went outside the cash fund. He included in his reconstruction of the accounts, items of withdrawals from the guardianship bank accounts which were applied to other purposes, including deposits made in bank accounts used in part in connection with the business of the lumber yards. The reason that the guardianship bank account was not at all times in complete reconciliation with the cash fund was because Mr. Stormfeltz drew out large sums that he did not invest forthwith in accord with court orders directing investments. He made collections from investments for the estate, which he did not deposit in the guardianship bank accounts, and he made deposits therein from sources outside the guardianship cash fund. Undoubtedly, if Mr. Rader could have made a complete and perfect reconciliation of all of Mr. Stormfeltz's bank accounts with his reports, he would have proved thereby exactly the amount of the cash fund chargeable to the guardian at the ward's majority. But Mr. Rader was unable to identify many of the transactions with any bank account entries. He apparently did not even have all of Mr. Stormfeltz's bank accounts, as he finds some securities listed in the probate reports for which he finds no record of purchase money checks whatever. It was clear that Mr. Stormfeltz had not kept his account or made his reports concerning the cash fund on the basis of any such system of bookkeeping as Mr. Rader attempted to construct out of the insufficient data available to him.

The basis of settlement as to the cash fund adopted by the court was sustained by the evidence and the court was not in error in refusing to find in accord with the reconstructed account prepared by Mr. Rader. The claimed $9,495.18 credit was not established so as to afford an offset to the judgment on the 19th count.

The defendants also asserted a right of offset against the amount of $4,796.02 found under Count 11 to have been converted from the Jamesport yard on December 22, 1915. They claimed that the guardian was entitled by reason of advancement made by him to four items of credit in the aggregate sum of $4,969.91 which he had the right to offset against his liability for converting said sum of $4,796.02 out of the profits of the Jamesport yard.

One of the four items of alleged advancement was the sum of $795.15. It appeared that $795 had been drawn out of one of the personal bank accounts of Stormfeltz on March 23, 1914, and that $795.15 had been deposited in a guardianship bank account on the same day. There was nothing to indicate the source of either sum of money, or what the occasion was for the withdrawal or for the deposit. The guardianship bank account into which the $795.15 was deposited was a part of the cash fund of the estate. The cash fund was separately reported upon, accounted for and turned over in full to the ward at his majority. The fact that an item of $795.15 was deposited in one of the guardianship bank accounts of the cash fund did not of itself afford a basis for the guardian to assert a general credit balance in his favor against his ward to offset against the proved conversion. Upon consideration of all the transactions respecting the cash fund, the court properly found nothing due either the guardian or the ward on account of said fund. That conclusion precluded the claim that an item of advancement had been by the guardian to that fund which he could use as an offset to a conversion from the yard business. The offset of $795.15 was properly denied.

Another item similarly circumstanced was the sum of $1,274.76 which was the aggregate of certain expenses incurred by the guardian. The defendants' expert Rader testified that he found no withdrawal of guardianship funds from the guardianship bank accounts to correspond with this item and offered it as a credit to the guardian to offset the conversion of the profits from the Jamesport yard. But the account of the expenses of the guardian was all settled and allowed for in the determination upon the cash fund and there was no error in refusing to allow this particular item of that fund to be again applied in offset against the converted profits.

The next of the four items of advancements was a promissory note from the Jamesport yard to Stormfeltz for $1,400. An entry, L. J. Stormfeltz note

for $1,400, appeared on the journal of the Jamesport yard under date April 7, 1917. The defendants' accountant Rader testified that he had been unable to find from his study of all the books that the $1,400 note had ever been paid to Stormfeltz. But we find no evidence that Stormfeltz had actually advanced this sum of $1,400 to himself as guardian, or that the Jamesport yard account became or remained indebted to him in the sum of $1,400 and his claim to offset on this item was rightly denied.

■ The next item was $1,500 alleged to have been advanced by Stormfeltz to the ward's Princeton yard on June 14, 1913. On the date of June 4, 1913, an entry appears on the ledger sheet of the Princeton yard posted from its journal under miscellaneous receipts " $1,500.00", which in the opinion of the expert, Mr. Rader, was a "fair credit to L. J. Stormfeltz." This alleged credit in the accounts of the Princeton yard is the $1,500 credit which defendants claimed the right to use as an offset against the $4,796.02 conversion from the Jamesport yard found in Count 11. The basis for it is the same reconstruction of the guardianship accounts by Mr. Rader which was considered in regard to the cash account of the estate.

The question for the trial court was whether the obligation of the guardian in respect to the ward's Jamesport yard and in respect to his Princeton yard was more accurately disclosed by the books of the respective yards or by the reconstructed account. The defendants had pleaded and the evidence showed that the books of each of the yards were carefully and accurately kept. The books of each of the yards showed that accumulations of capital investment had accrued to each and that the guardian had made conversions to his own use out of the funds of each yard. The court found the obligation of the guardian to the ward in respect to the Jamesport yard by comparing the books of the yard with the accounting made in regard to that yard. The obligation of the guardian in respect to the Princeton yard was found in the same way. The defendants' accountant Rader, in his reconstruction of the accounts of the guardianship, assumed to present an accounting of the whole of the guardianship trust as a single unit instead of accounting for it in its three parts of cash fund and two separate yards, as the guardian had done over the long period of the ward's minority. Bringing the business of the Jamesport yard and that of the Princeton yard together into the one reconstructed account, Mr. Rader has carried forward the $1,500 item on the Princeton books as a credit to Mr. Stormfeltz and sought to justify the use of it as an offset against the conversion of the funds of the Jamesport yard.

Undoubtedly the accounts of the guardianship could have been kept for the guardian in the form of an account between Mr. Stormfeltz and a single trust fund. Even though they were not so kept during the years of the trust period, an accountant in possession of all the data might accurately construct such an account in that form. But where the accounts were in fact kept, and the estate was reported upon under a different but equally accurate and informative method, the accounts as they were actually kept would appear to be the more reliable and probative. As they showed the Jamesport yard as one business and the Princeton as another, the trial court rightly treated them separately and there was no error in the refusal to adopt Mr. Rader's accounting method, or to offset the $1,500 item found in the books of one business against the proved conversion from the funds of the other.

Neither one of the four items relied upon by defendants constituted a proper offset against the conversions proven under Counts 11, 15, 16 and 19. The judgment for conversions of profits from the Jamesport yard upon Counts 11, 15, 16 and 19 was without error as to the principal amount.

#### Counts 17 and 22.

■ After finding that the guardian had converted the several items of the funds of the Jamesport yard in the aggregate amount of $8,896.02 as alleged in Counts 11, 15, 16 and 19, and awarding judgment therefor, the court proceeded to Counts 17 and 22. The findings (to be read with the others) were:

#### "Count 17.

"The Jamesport recap dated December 31, 1917, shows an entry, 'Sund. Inv. unpaid $3,019.45', as a liability of the yard. On January 1, 1918, a check for $3,019.45 was issued by the yard to E. Hollister in payment of this so called liability. The journals of the yard do not show that this payment was made for merchandise. At that time a bill register was kept at the

yard in which were recorded all of the invoices of the yard, and which showed the number of the specific check by which specific invoices were paid. The bill register discloses no liability of $3,019.45, nor does it disclose that the check to E. Hollister was used for the payment of invoices. Remittance records were also kept by the yard at that time, and are in evidence. These records do not show that the check for $3,019.45 was sent to Hollister for the payment of invoices.

"Hollister, as has been pointed out, was not only manager of the Princeton yard but was general manager of all of the yards which Luther Stormfeltz operated either for himself or for his ward. An account had been opened in the Farmers Bank at Princeton in the name of 'Stormfeltz Lumber Company, General Account'. The Princeton and Jamesport yards and also the yards claimed by Stormfeltz, namely, the Leon yard, and later another yard, the Shanafelt acquired by Stormfeltz at Seymour, Iowa, in 1916, and also a yard at Jameson, Missouri, all were operated by Hollister through his General Account.

"Purchases made by each of the yards were billed directly to the individual yard receiving the merchandise. The general rule was that when the individual yard drew a check on its own bank account in payment of an invoice, the check was not drawn to order of the invoice creditor, but to the order of Hollister, and the invoice and check were sent by the individual yard to Hollister at Princeton, with a letter of remittance showing the amount and name of the payee of the invoice. Hollister then would deposit the check in the General Account at Princeton, and draw a check on that account to the order of the invoice creditor. Various sums of money claimed by Luther Stormfeltz personally, and various sums of money coming to him from the yards he claimed as his own at Leon, and Seymour, Iowa, and at Jameson, Missouri, were placed in the General Account for his own use.

"In theory the general account was merely a clearing account and was not supposed to contain any balance. However, in practice the general account showed large balances of money remaining therein for long periods of time. Defendant Stormfeltz testified that his ward owned no part of such balances. Stormfeltz set up the General Account for his own benefit and for his own purposes. No reason existed because of which the Jamesport or Princeton yards could not have paid their bills directly. Instead, however, Stormfeltz made himself the debtor of his ward every time a check coming from relator's yards at Jamesport or Princeton was deposited in the General Account. He cannot be relieved of liability therefor except on proof that the money was paid from the General Account to or for the Jamesport or Princeton yards. It is not reflected on the Jamesport or Princeton yard records nor in any other record or account of the guardianship.

"The General Account was the account of the defendant Stormfeltz, and not the account of the relator's estate. Defendants' contention that they have properly accounted to relator whenever it appears that money from the Jamesport or Princeton yards went to Hollister for deposit in the General Account is not sound. Defendants have not shown that the $3,019.45 item of December 31, 1917, was disbursed by the General Account for the benefit of relator or his estate, or that relator's estate owed said sum to the General Account. Defendants have not accounted to the relator for the $3,019.45. Thereon relator is entitled to judgment.

"Count 22.

"The Jamesport recap dated December 17, 1919, lists an item, 'Sund. invoices $4,434.91' as a liability of the yard. On February 28, 1920, $4,373.91 was paid out of the Jamesport yard by check in favor of E. Hollister to retire $4,373.91 of the above liability. The records of the Jamesport yard do not show that any merchandise or other value was received by it in consideration for this money. The bill register kept at the yard at that time does not show the application of the $4,373.91 for the payment of any account or accounts, nor do the remittance sheets kept at the yard at that time show that this money was sent to Hollister for the payment of any invoice or invoices.

"Defendants' contention that this money went to the General Account amounts to nothing in the absence of further proof. The General Account was not owned by the relator's estate, but was owned solely by defendant Stormfeltz, and tracing of money into that account is the same as tracing it into his pocket. Defendants have not shown or attempted to show that the $4,373.91 of December 17, 1919, was

disbursed by the General Account for the benefit of relator or his estate or that relator's estate owed said sum to the General Account or to any other thing or person. Defendants have not accounted to the relator for the $4,373.91. Thereon relator is entitled to judgment."

The appellants complaining of the findings and judgment on these counts admit: "The finding of the court as to Count XVII correctly recites that Hollister was Manager of the Princeton Yard and was General Manager of all the Yards which the defendant Stormfeltz operated either for himself or his ward; that an account had been opened in the Farmers Bank at Princeton in the name of 'Stormfeltz Lumber Co. General Account' and that the Princeton and Jamesport Yards and all of the Yards claimed by Stormfeltz, that is, the Leon Yard, and later another Yard, at Seymour, Iowa, known as the Shanafelt Yard, and the yard at Jameson, Missouri, were all operated by Hollister through this General Account; that purchases made by each of the Yards were billed directly to the individual yard receiving the merchandise and that the general rule was that when the individual yard drew a check on its own bank account, in payment of an invoice, the check was not drawn to the order of the invoice creditor but to the order of Hollister and the invoice and check were sent by the individual yard manager to Hollister at Princeton with a letter of remittance showing the amount and name of the payee of the invoice; that Hollister would then deposit the check in the General Account at Princeton and draw a check on that account to the order of the invoice creditor."

But it is insisted that the undisputed record evidence compels the conclusion that the withdrawals of the amounts of the "Sundry" items of $3,019.45 and $4,373.91 were made in the due course of the business of the Jamesport yard, that they were for merchandise for the yard, and that there was no substantial evidence that the moneys were converted by the guardian. It is argued that the checks for the amounts of the sundry items were drawn at about inventory time when the new recapitulation was being set up on the yard books; that the books were not kept so as to show unpaid merchandise accounts; that in the regular course of the business the withdrawals and the entries reflecting them would have been proper if there were

such unpaid merchandise accounts outstanding and that none of the money had been traced into the hands of Mr. Stormfeltz individually. Oral testimony was given by Mr. Stormfeltz and by Mr. Somerville which is also relied on to establish that the withdrawals were properly made to pay for merchandise bought by the yard. It was the opinion of the defendants' expert accountant Rader that the items represented merchandise bought for the yard and paid for by the checks.

On the other hand, Mr. Somerville's job was to run the Jamesport yard for his employer and to keep the accounts to show every dollar he took in and every one that he paid out and what it was for. The admission of the pleadings that he kept his accounts accurately was borne out by the evidence. The accounting system he followed was adapted to reflect the details of the business done and the profit or loss. He testified that if the withdrawals in question had been for merchandise, the remittance books would show the merchandise, and they did not. The amounts were large sums in that business and it is not credible under the circumstances that they were paid out on merchandise without invoices to show for the transactions. As Mr. Somerville testified: "It is evidently part of the profits for that year". We find substantial evidence to sustain the court's findings on the 17th and 22d counts. The general finding that the items were abstracted and converted to his own use by the guardian, taken with the detailed findings, sustain the court's judgment as to the principal amount thereof.

### Counts 43, 44, 66.

Proceeding to Counts 43, 44 and 66, the court made findings (to be read with the others) as follows:

### "Count 43.

"On October 9, 1922, a check for $500.00 was issued by the Jamesport yard to the order of Luther J. Stormfeltz and charged to him on its journals. The check bears the indorsements of the defendant Stormfeltz and of the J. C. Nichols Realty Company; the defendant Stormfeltz testified that he used this check in part payment of the purchase price of a lot in the Sunset Hill Addition in Kansas City where he later built his home.

"The guardian did not report this transaction to the probate court nor did he charge himself with this sum as additional

inventory. Neither the cash fund nor the Princeton yard were augmented through this $500.00 withdrawal from Jamesport. Judgment of this Count should be for the plaintiff as prayed.

### "Count 44.

"On August 28, 1922, a check for $1,000.00 was issued to Luther J. Stormfeltz by the Jamesport yard and charged to him on its journals. The check was deposited by Stormfeltz in his personal account in the West Side State Bank of Commerce.

"The guardian did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard were augmented through this $1,000.00 withdrawal from Jamesport. Judgment on this Count should be for the plaintiff as prayed.

### "Count 66.

"On December 16, 1922, a check for $1,000.00 was issued by the Jamesport yard to E. Hollister and the amount of the check was charged on the yard books to Stormfeltz.

"The guardian did not report this transaction to the probate court, and did not charge himself with it as additional inventory. Neither the cash fund nor the Princeton yard were augmented through this $1,000.00 withdrawal from Jamesport. Judgment on this Count should be for the plaintiff as prayed.

"The $500.00 represented by Count 43, the $1,000.00 represented by Count 44, and the $1,000.00 represented by Count 66, all were charged to Luther Stormfeltz on the journals of the Jamesport yard, constituting a total debit against him of $2,500.00.

"This debit was carried from day to day in the journals of the Jamesport yard until December 22, 1922. On that date the fiscal year of the Jamesport yard came to an end. Concurrently, the account of Luther Stormfeltz on the books of the Jamesport yard was simply expunged, without any repayment of the $2,500.00 which he had taken, and which the books of the yard had shown standing as a charge against him. But the books as opened for the new fiscal year show no debit against him and a corresponding diminution of the yard's investment. In other words expunging the Stormfeltz debit meant depriving the yard of that much of its capital."

The expert for the defendants considered the items of counts 43, 44 and 66 charged on the books of the Jamesport yard to Mr. Stormfeltz but found an offset in that a check was drawn by Stormfeltz Lumber Company, Seymour, Iowa, on December 16th, 1922, to Stormfeltz Lumber Company, which was endorsed Stormfeltz Lumber Company and paid. But it was not shown that the amount of that check had been applied to repay the conversions found under these counts or to augment the ward's estate. The evidence sustained the findings of the court and the findings sustain the judgment for the principal amount of these counts.

### Counts 36, 37, 38, 39, 40, 41.

▇▇▇▇ Proceeding to counts 36 to 41, inclusive, the court made findings (to be read with the others) as follows:

### "Count 41.

"The Jamesport journals show that on January 17, 1924, $5,000.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

### "Count 40.

"The Jamesport journals show that on August 10, 1924, $300.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

### "Count 39.

"The Jamesport journals show that on September 4, 1924, $500.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

## "Count 38.

"The Jamesport journals show that on September 11, 1924, $500.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

## "Count 37.

"The Jamesport journals show that on September 16, 1924, $400.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

## "Count 36.

"The Jamesport journals show that on December 6, 1924, $2,000.00 was taken from the Jamesport yard and charged to the defendant Stormfeltz on the journals of that yard. The defendant Stormfeltz did not report this transaction to the probate court nor did he charge himself with this sum as additional inventory. Neither the cash fund nor the Princeton yard was augmented through the withdrawal of this amount from the Jamesport yard.

"The items represented by Counts 36 to 41, inclusive, were all charged against Luther Stormfeltz on the journals of the Jamesport yard. These items total $8,700.-00, and the Jamesport journal shows such a charge against Luther Stormfeltz on February 28, 1925, the date of relator's majority. Luther Stormfeltz did not repay these items.

"In his so-called 'Final Settlement' of March 26, 1925, Luther Stormfeltz reported the book value of the Jamesport yard at $43,408.52. But a part of this valuation consisted of his own liability of $8,700.00 on Counts 36-41. He treated this $8,700.00 as a part of the yard assets. Yet he did not disclose such fact in that or any other settlement. It was a concealed liability. He never has repaid it. He now repudiates the fact of its existence. However, it is amply established."

It will be observed that the amount in the above six counts is the sum of $8,-700 which was drawn out of the funds of the Jamesport yard and charged to L. J. Stormfeltz on the yard's books. It was shown that he knew of the charge and that when he accounted for and turned the Jamesport yard over to the ward he included the total of the charge against himself as a part of what he turned over.

The defendants claimed in the trial court that the money taken out of the Jamesport yard was put directly into the ward's Princeton lumber yard and was not converted by the guardian and they contend in this court that the evidence permits of no other fair inference.

As has been stated, the business of the Jamesport yard was kept a separate trust unit by the guardian in all of his reports to the probate court and in the turn over to the ward at majority. The pleadings and evidence establish that the accounts that were kept and produced in evidence correctly show the business and the transactions in respect to that unit of the guardianship trust. The court's finding that the money was taken out of the Jamesport yard funds was fully sustained. The finding that the cash fund was not augmented by the money was also sustained. But before passing on the trial court's finding that the money was not put into the Princeton yard, it is to be recalled that that yard was also treated, reported on and turned over by the guardian as another separate unit of the guardianship estate and the case as to that yard must be considered.

The trial court found:

## "The Princeton Yard.

"The Princeton yard had its own set of ledgers and journals and ostensibly its own bank accounts at Princeton, entitled 'Stormfeltz Lumber Company Yard Account'. However, defendant Stormfeltz deposited in and withdrew from this account large amounts of money which he claims belonged solely to him, and not to relator's estate. Stormfeltz made these deposits and withdrawals without making any record whatever thereof. The ledgers and journals of the Princeton yard and the guardianship account, and reports to the probate court, contain no mention of such transactions.

"From December 22, 1922, to December 19, 1924, a total of $47,767.29 was deposited in and withdrawn from the above account,

which was not shown or disclosed by the journals or ledgers of the Princeton yard or the records of the guardianship account or the settlements in the probate court.

"Defendants claim credit for some of these deposits thus commingled with relator's funds, as set-offs against plaintiff's claims. However, Stormfeltz had no right to thus commingle his private funds with those of relator and for that reason and the further fact that such deposits all were withdrawn by Stormfeltz for his own purposes, and relator received no benefit thereby, no credit is due defendants because of such deposits."

It clearly appears that the lumber business of the Princeton yard as it was carried on from day to day was fully and accurately recorded in its books. They showed what was bought and sold and the profit or loss. But the bank account of the business was not maintained in balance with the real state of the business. Mr. Stormfeltz used the bank account for his own purposes, both for deposits and withdrawals, and the court's findings concerning such user are sustained by the evidence. It is also clear that a wrongful commingling of funds as found by the court did result from this use made of the bank account of the business. Therefore, the best evidence as to what the estate which accrued to the ward in the Princeton yard consisted of, must be found in those books of account that show its business, what it had to start with, what was bought and sold and what the profits were. The checking account in the bank being a commingled fund, did not reflect the condition of the business.

Reverting to the claim that the $8,700 which L. J. Stormfeltz caused to be taken out of the Jamesport yard as found in counts 36–41 was put into the ward's Princeton yard, the evidence goes no further than to show that the items of counts 36–40 were transferred into the Princeton bank account. The five thousand dollar item of count 41 charged to Stormfeltz on the Jamesport books went to diminish the discrepancy which then existed between the cash balance on hand of the Princeton yard as it actually was, and as it was shown to be by "cash" account on the books of the yard. The items were not shown to have augmented the Princeton yard unit of the ward's estate. As the withdrawals from the Jamesport fund were proved and no augmentation of the other funds of the

estate occurred, the finding of conversion was justified.

The judgment on counts 36–41 are without error as to the principal amount of the judgment.

 Proceeding to Count 6, the trial court made the finding (to be read with the others):

"Count 6.

"The records of the Princeton yard show that from July 5, 1912, to January 2, 1913, that yard made a profit of $1,916.01. On the last named date the journal of the Princeton yard shows that this amount $1,916.01 was paid to the 'Stormfeltz Lumber Company'. The guardian did not charge himself with this amount as additional inventory in the probate court; neither the cash fund nor the Jamesport yard was augmented by this amount. Thereby the estate of relator suffered a loss of $1,916.01, and relator should have judgment therefor as prayed."

The appellants attack the sufficiency of the evidence to sustain the judgment on this count but the books of the yard show that the yard had the profit as found by the court, that the investment account was duly credited with it and that "that amount was taken out of the yard". Appellants contend that the money was not traced into the hands of Mr. Stormfeltz beyond the showing that it was taken out of the Princeton yard and that it was not applied to augment either the cash fund or the Jamesport yard. But as the estate consisted of the three funds, the proof of the taking of the money from the Princeton yard without replacing it in any other fund of the estate sustained the inference of conversion drawn by the trial court, and no error is found in the judgment as to the principal amount.

Count 8.

 The court's finding upon Count 8 (to be read with the others) was:

"Count 8.

"The records of the Princeton yard show that on April 1, 1914, $2,500.00 was taken from the yard by check payable to 'Stormfeltz Lumber Company'. This check was deposited to the personal account of the defendant Stormfeltz in the Farmers Bank at Princeton. The guardian did not report this transaction to the probate court nor did he charge himself with this sum

as additional inventory. Neither the cash fund nor the Jamesport yard were augmented through this $2,500.00 withdrawal from Princeton, and relator should have judgment therefor as prayed."

The evidence is that the $2,500 referred to in this count was taken out of the Princeton yard, deposited to the personal account of L. J. Stormfeltz and drawn out by him in small sums over a long period of time. It was evidently not used to buy securities for the ward. The expert accountant Rader gave it as his opinion from his studies and compilations from the bank checking accounts, that the guardian had at about the time of the withdrawal purchased a $3,000 Stanley mortgage for the ward, which mortgage was reported by the guardian in his second annual report and accounted for by him in the cash fund. No identification was made of the source of the payment made for the Stanley mortgage by the guardian and it was fairly inferable that Mr. Stormfeltz had some other checking account used in the purchase of the mortgage which was not accessible to the accountant. It was the expert's opinion that the cash fund was augmented to the extent of the withdrawal of the 8th count and that the $2,500 was accounted for in the cash fund. But the contrary conclusion of the court is supported by the records and computations in evidence. The ward has not relied entirely upon the determination as to the cash fund heretofore considered, but has set out the figures of the transactions in the cash fund in the period of the second annual report of the guardian when he reported and charged himself with the Stanley mortgage. The contract between the guardian and his sureties required the moneys of the cash fund of the estate to be kept in banks subject to the joint control of the guardian and sureties, and there was evidence the requirement was circumvented by the guardian. He obtained authority from the probate court to make loans and the sureties accordingly joined in withdrawals of funds from the banks. But some of the loans were not made. The guardian also made collections from loans which he did not forthwith deposit in the controlled accounts. It resulted that the second annual report of the guardian did not charge him with a greater amount of securities in the cash fund than the aggregate of the amounts which he had been authorized to and had drawn out of the fund for the purchase of securities. It was not proven that the guardian had contributed the amount of the Stanley note to the cash fund or that the court's determination as to that fund was erroneous. No error is found in the judgment for the principal sum of Count 8.

### "Princeton Sundry Counts" Nos. 26, 29, 31, 32, 34, 57, 56, 55, 54, 53, 49, 48, 47, 42 and a New Count Added to the Petition.

The court's findings on these counts (to be read with the others) were:

"Counts 26, 29, 31, 32, 34, 57, 56, 55, 54, 53, 49, 48, 47, and 42, and a new count to be added to the Petition.

"On December 6, 1918, an account entitled 'Sundries' was opened on the Princeton books. This Sundries account contains all the items which are the subject of the Counts 26, 29, etc., numbered above.

"A full copy of the Sundries account, with the corresponding numbers of the counts of the petition relating thereto, is set forth as Exhibit A, p. 1 at page 255 of relator's main brief. An analysis of the account is contained in plaintiff's main brief, pages 176–240.

"The first entry contained in this account, dated December 6, 1918, consists of a credit, wholly without explanation, of $3,393.55. On Dec. 12, 1919, an additional unexplained credit was placed to Sundries of $1,107.09. The total of the two credits in favor of 'Sundries' and against the yard is $4,500.64.

"The books of the Princeton yard do not show that it or the estate of relator received any benefit because of the ostensible liability of the yard through the two above mentioned credits set up in favor of Sundries, except only as to the Mullinax lot, a $750.00 item hereinafter mentioned. The evidence shows that with the above exception the liability created by those credits was wholly fictitious. They operated merely to pave the way for a series of debits on account of money subsequently paid by the yard to Stormfeltz.

"On April 21, 1920, the Princeton journal shows that $1,077.58 was paid to Stormfeltz and debited to Sundries. The yard was not indebted to him. There was no corresponding augmentation of the cash fund nor of the Princeton or Jamesport yards by reason of this payment. The amount of the debit was 100% loss to relator. Defendant Stormfeltz has not ac-

counted to relator for this money. The item as not included in relator's petition, but he has filed a motion, now pending, for leave to amend by adding an additional count therefor, to correspond with the evidence. Leave to make such amendment should be granted, and plaintiff should have judgment thereon.

"On May 26, 1920, $750.00 was paid out of the Princeton yard and debited to 'Sundries' on the journal. The evidence shows that this sum went for the purchase of what is called the 'Mullinax' lot, a small tract of ground adjoining the Princeton yard and which became a part of that property. Hence relator asks nothing on account of this item.

"On Sept. 3, 1920, $1,000.00 was paid to the defendant Stormfeltz out of the cash of the Princeton yard, and debited against Sundries (Count 26).

"On Sept. 27, 1920, $500.00 was paid Stormfeltz out of the cash of the Princeton yard (Count 29) and debited to Sundries.

"On October 8, 1920, $750.00 was paid to Stormfeltz out of the Princeton yard (Count 31) and debited to Sundries.

"On October 21, 1920, $423.06 was paid to Stormfeltz out of the Princeton yard (Count 34) and debited to Sundries.

"The total of the aforesaid debits in the Sundries account is $4,500.64. It exactly balances the two original credits therein, with which the account was opened, namely $3,393.55 on 12/6–1918, and $1,107.09 on 12/14–1919, which total $4,500.64. Thus the whole amount of such credits was paid in cash to Stormfeltz. He has not accounted to relator for any of such payments except only the $750.00 of 5/26–1920, for the above mentioned 'Mullinax' lot. Hence he is liable to plaintiff on the new count which he is permitted to add to his petition, and on Counts 26, 29, 31 and 34, in the sum of $3,750.64, plus interest.

"On October 18, 1920, $1,000.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 32) and was debited to Sundries.

"On Feb. 26, 1921, $1,900.71 was paid to Stormfeltz out of the cash of the Princeton yard (Count 57) and was debited to Sundries.

"On June 7, 1921, $300.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 56) and was debited to Sundries.

"On Aug. 15, 1921, $200.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 55) and was debited to Sundries.

"On October 3, 1921, $350.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 54) and was debited to Sundries.

"On October 7, 1921, $500.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 53) and was debited to Sundries.

"On November 2, 1921, $1,000.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 49) and was debited to Sundries.

"On June 1, 1922, $600.00 was paid to Stormfeltz out of the cash of the Princeton yard (Count 48) and was debited to Sundries.

"On June 24, 1922, the Princeton journal shows cash tickets to date of Luther Stormfeltz of $1,331.95 (Count 47) representing money he had taken from day to day out of the cash drawer of the Princeton yard, which is debited to Sundries.

"On October 19, 1922, the Princeton journal shows cash tickets to date of Luther Stormfeltz of $1,655.65, (Count 42) representing money he had taken from day to day out of the cash drawer of the Princeton yard, balanced by a corresponding debit to Sundries.

"On this last date (10/19–1922), the net debit against Sundries was $8,838.31. This was carried forward from day to day on the journals of the Princeton yard and so stood on Feb. 28, 1925, when relator attained his majority.

"In his so-called 'Final Settlement' of March 26, 1925, defendant Stormfeltz reported the book value of the Princeton yard at $46,914.20. Recorded in the journal of the yard as a part of the assets which went to make up this total, was the above mentioned $8,838.31 debit of Stormfeltz to Sundries, for cash that had been paid to Stormfeltz. The fact that such indebtedness existed was not disclosed by the settlement.

"After the above settlement was made, the foregoing debit to Sundries was carried forward on the journals of the yard from day to day until Aug. 19, 1927. On that date, Hollister, who still remained in charge of the Princeton yard as relator's manager, entered a credit, at the request

of defendant Stormfeltz, in the Sundries account reading as follows:

" ' To court order—$8,838.31'.

"Thereby the Sundries account was balanced. On the same date, Hollister wrote on the left margin of that day's journal page (Princeton journal No. 8, p. 105 white P. X. 105) a memorandum reading as follows:

" 'Sundries Cr. $8,838.31 by L. J. S.

" 'Bal. $5,161.69 on cash drawer tickets.'

"The total of these two sums of $8,838.-31 and $5,161.69 of cash drawer tickets is an even $14,000.00. Hollister then debited the investment account of the yard with that amount of money. The entry in the investment account reads:

" 'Investment Acc't. To court order L. J. S.' db $14,000.00.

"In other words, the $8,838.31 of money received by Stormfeltz and debited in the Sundries account during the period 10/18–1920—10/19–1922, and $5,161.69 additional, on account of money taken by Stormfeltz from the cash drawer of the Princeton yard, which does not theretofore appear on the books, was finally deducted from the investment of relator in the yard. The foregoing entries mean that relator has been a loser in the sum of $14,000.00.

"Stormfeltz, by having Hollister enter the foregoing $8,838.31 credit in the sundries account as part payment of his $14,-000.00 claim for compensation thereby admitted that the debit balance in the Sundries account was owed by him.

"There was no court order allowing Stormfeltz $14,000.00 for his services. True, Stormfeltz had a paper, dated 6/28–1925, signed by one Brantley, now deceased, who at that time was judge of the probate court, which paper read like a court order making such allowance. But this paper never was filed in the probate court, and never was recorded on the journals of the probate court, and nothing equivalent thereto was so recorded. Hence there never was any such court order and no such allowance was made.

"The $8,838.31 credit written by Hollister on 8/19–1927 in the Sundries account was made without any authority from relator, and without his knowledge or consent. Relator knew little about accounting. He knew the Sundries account was standing on the books, but did not comprehend its actual significance. Relator did not discover that the above mentioned $8,838.31 credit had been entered until some days or weeks later. When he discovered it Hollister gave as an explanation, that the entry was made because the probate court had made an order in the matter of relator's estate on 3/28–1925, whereby relator was charged with $14,000.00 as compensation to his father for acting as his guardian, and which relator never had paid. That was the first that relator had heard of such allowance, but his confidence in Hollister was such that he believed his statement, and did not discover its falsity until the year 1930, when his attorneys began delving into the transactions of Stormfeltz, and encountered the facts as related above.

"On the above stated facts, defendant Stormfeltz is liable to relator on each of the ten counts of his petition last above mentioned, namely counts 32, 57, 56, 55, 54, 53, 49, 48, 47, and 42, which total $8,838.31, plus interest."

The appellants again attack the sufficiency of the evidence to support the findings and the sufficiency of the findings to support the judgment, and it is contended as to all of the items that the guardian had made advancements more than offsetting the withdrawals. The compilations of the accountants relied on by appellants have been studied together with the arguments but it would unduly prolong the opinion to discuss the details. The evidence sustains the trial court's conclusion that the aggregate sum of $8,838.31 was drawn out of the Princeton yard and converted to the use of Stormfeltz as found by the court, and no corresponding advances to augment the ward's estate were made by the guardian. The credit on the books to sundries against which the withdrawals to the use of Stormfeltz were made did not represent advancements made by Stormfeltz or justify the withdrawals. Mr. Stormfeltz admitted in his deposition that he had checked the books at the time of his attempted settlement with the ward to ascertain how much he personally owed the estate for moneys expended for him personally, and that it was his recollection that the $14,000 covered it. It was in this belief on his part that he caused the bookkeeper to make the entries on the books of the Princeton yard by which these amounts charged to him were balanced off through the purported order of allowance of $14,000 for his services to the estate. The findings were sufficient and they were supported by the evidence.

■ The appellants contend that the document signed by the probate judge, by the terms of which allowance of $14,000 or $1,000 a year was made for Stormfeltz for his services as guardian, should have been given effect by the trial court as a valid order of the County court. It was never entered as an order by the probate court and the records of that court negative that such order was made in the course of the judicial proceedings of that court. In State ex rel. Spratley v. Maries County, 339 Mo. 577, loc. cit. 580, 98 S.W.2d 623, loc. cit. 624, the Supreme Court of Missouri said: " 'If there is any proposition of law that is fundamental and settled, it is that a court of record can speak only by its records, which import absolute verity and are not open to collateral attack,' State ex rel. Conran v. Duncan, 333 Mo. 673, loc. cit. 682, 63 S.W.2d 135, loc. cit. 139, and cases there cited; and 'this rule applies not alone to final judgments, but to every order made in the course of a judicial proceeding,' State ex rel. Conran v. Duncan, supra; State ex rel. Van Hafften v. Ellison, 285 Mo. 301, 226 S.W. 559, 12 A.L.R. 1157."

The District court did not err in refusing to recognize or give effect to the alleged order of allowance of guardian fees.

■■ The appellants also contend that when the ward accepted and retained the Princeton yard, he became informed that one of the accounts receivable shown upon its books was the charge against his father in the Princeton sundries account, and that he accepted his father as his debtor and waived any claim he might have had against the father's bondsman. The point is forcefully argued and is not without appeal. But the ultimate of it would be that a guardian could by the mere recording on the account books of unexplained charge entries against himself, exempt his bond and avoid the probate or other court authority. We are not persuaded that appellants' contention should have been sustained. The facts concerning the ward's ignorance of accounting and the significance of the book entries and the circumstances under which the entry of the $14,000 credit was made, were found by the court in accordance with the ward's testimony. It was not shown that the ward knew that the guardian had converted the items of these counts or that he had become obligated on account thereof as guardian, and no action was knowingly taken by the plaintiff evincing any intention to waive his cause of action against defendants. The ward brought the suit six years after attaining majority and as soon as he found out the facts and the existence of the cause of action. He did nothing to change defendants' position. It is true, as appellants contend, that if the suit had been brought promptly in 1925, instead of in 1931, the damage to the sureties would have been lessened. But the suit was brought within the statute of limitations and estoppel by waiver or otherwise was not proved. We find no error in the permission granted to the plaintiff to amend his petition by adding the unnumbered count. The amendment conformed the pleading to the proof. The judgment on these counts is sustained as to the principal amount.

## The Remaining Counts.

Judgment was entered upon the other counts in the case for compound interest found to be due on account of moneys taken out of the ward's estate by the guardian for which repayments were found to have been made of the principal sums only. Judgment was also entered for compound interest upon sums of money which were shown to have been kept by the guardian without investing them in sanctioned securities during the ward's minority.

■■ The interest accorded by the judgment aggregates a very large amount and presents serious question which must be determined according to the statutes and decisions of Missouri. In several respects the circumstances of the case are unusual and without exact precedent in the state. At first the ward's estate consisted of money and corporate stock, and the contract of the bonding company to retain joint control over the bank accounts appeared to afford it the means of protection against loss to the ward or to itself, and that result was accomplished so far as the cash fund of the estate was concerned. That fund was fully accounted for to the ward and although parts of the fund were left in bank drawing only depositors' rate of interest some of the time, the total interest earnings accounted for in the cash fund amounted to $34,720.28 as found by the trial court. The total amount which accrued to the cash fund from the estate of the ward's ancestor and the estate of his aunt was found to be $52,965.88, and there were proper deductions from that sum

amounting to $39,389.72. It is readily seen from these figures that interest earned and allotted to the cash fund amounted to about $2,500 per annum throughout the period of guardianship and averaged nearly five per cent upon the total cash fund. That interest earning was an adequate and fair amount and as much as could be safely obtained by prudent investment sanctioned by law, according to the evidence. There is no claim that the guardian actually obtained more, and his due diligence in respect to interest earning on the cash fund was demonstrated by his obtaining and accounting for the amount turned over in that fund.

We think the Missouri statutes and decisions above cited did not require or authorize the court to impose judgment against the defendants for any further or greater sums on account of interest in respect to the cash fund than the fair and adequate amount which was accounted for by the guardian to the ward at his majority, even though there were at times moneys in that fund not invested on mortgage or in other sanctioned securities.

The matter of interest chargeable against the guardian in respect to his conversion of funds out of the Jamesport and Princeton lumber yards, which he operated throughout nearly the whole period of the ward's minority, is more complex. It appears beyond question that the businesses were successfully carried on so as to produce a considerable profit for the ward. They were operated as part of a chain of lumber yards, able to make large purchases and otherwise to effect economies. Undoubtedly the guardian's success was attributable in part to the general set up of the business that was of advantage to the ward. The proof on which the plaintiff made the recoveries which we sustain, was generally that the books of the yards showed certain business done and profits gained, and certain abstractions from the yards made by the guardian. Such proof established the conversions. On the other hand, it appears that the cash moneys of the yards after they had been deposited in banks were commingled and used by the guardian as he saw fit. The trial court found that the guardian had kept moneys in banks at the same time that he made large borrowings for the lumber business, in part to maintain bank credit.

There was substantial evidence to sustain such findings, but we are not persuaded that they required the court to impose the heavy burden of compounded interest upon the sureties over the long period of years since the conversions from the yards were made. Under Count III we held that the plaintiff was entitled to recover compound interest upon a sum of money which was paid to the guardian for the ward and which the guardian forthwith converted to his own use. That transaction came directly within the Missouri statute requiring the guardian to loan his ward's moneys and the guardian's dereliction in respect to the money required the imposition of the compound interest. Mo.R.S. 1929, Sec. 418.

But the operation of a lumber business by a guardian can hardly be brought within the statute concerning the loaning of the ward's moneys on mortgages. In such a venture, it might be imprudent to make permanent investment of all moneys not immediately required in the business. Although there is evidence here that the Princeton yard was compelled to borrow money at interest and that such necessity was in part attributable to the abstractions from the yard made by the guardian, the fact remains that the credit of both the yards was fully maintained and both were enhanced in value by the guardian's operation thereof. Under the particular circumstances of the case, we hold that neither Mo.R.S.1929, Sec. 418, nor Mo.R.S.1929, Sec. 3267, absolutely control the allowance of interest upon the several sums of money taken by the guardian from the lumber yards during his administration. Taking into consideration the profits and advantages that accrued to the ward from the long continued operation of his lumber yards by the guardian, we hold that the guardian's bondsmen should not be held to pay compound interest upon any of the items found to have been taken out of the yards and converted by the guardian, but should be held only for interest on the principal amounts of the conversions at the rate of six per cent from the date of conversion to the date of final judgment.

Particular exception has been taken by appellants to a declaration of law made by the trial court as follows: "If Stormfeltz made any advancement to the Princeton and Jamesport yards of his ward from his private funds, he is not entitled to credit therefor, because there was no promise of repayment."

It is contended that pursuant to his declaration of law, the trial court denied the defendants' offsets against the guardian's conversions from the ward's yards in instances where it was shown that the guardian had augmented the ward's estate by advancements equal to or greater than the amounts abstracted. But on careful search of the record, no such instance is found. The court made a part of its finding in respect to each item for which judgment was awarded that the amount taken by the guardian from one of the funds had not gone to augment either of the other funds, but that it depleted the fund from which the abstraction was made. The court also found that all deposits (claimed to be advancements) made by the guardian in the Princeton bank account were "withdrawn by Stormfeltz for his own purposes, and relator received no benefit thereby". The record reflects that the court in each instance considered whether any ground of offset existed by reason of advancements, but found none. The guardian had no credits for offset by reason of the cash fund.

The declaration of law complained of appears to have been stated by the court in abstract to meet some situation presented in the course of the trial, presumably in the same connection as its findings under Count 7. There the court stated, among other things, "It is one thing to credit a guardian for repayment of what he owes to the ward's estate, and quite a different thing to require the ward to repay to the guardian any amount the latter may have advanced beyond what he owes." The declaration so limited is supported by Wyatt v. Woods, 31 Mo. 351; Frost v. Winston, 32 Mo. 489, and Brown v. Chadwick, 79 Mo. 587. It is clear upon the whole record that no just credit or offset was denied the defendants and that no prejudice was occasioned them by this declaration of law.

The assignments of error presented, argued and considered are very numerous and need not be detailed. The considerations set forth are determinative of the case, and we conclude:

That the judgment as to each of the counts be reversed, with directions to the trial court to enter a new judgment in accordance with this opinion, as follows:

On Count I, for $36,974.27 with simple interest at 6 per cent per annum from July 5, 1912, to the date of the new judgment.

On Count III, for $12,410 with interest at 6 per cent per annum, compounded annually to February 28, 1925, with simple interest on the total sum to the date of new judgment.

On Counts 6 et seq., for the following amounts, with simple interest at 6 per cent per annum from the dates indicated to the date of the new judgment:

Jamesport Items.

| Count | From | | | Principal |
|---|---|---|---|---|
| 11 | Dec. | 22, | 1915 | $4,796.00 |
| 15 | Jan. | 17, | 1917 | 1,000.00 |
| 16 | Feb. | 2, | 1917 | 1,000.00 |
| 19 | Jan. | 13, | 1919 | 2,100.00 |
| 17 | Dec. | 31, | 1917 | 3,019.45 |
| 22 | Feb. | 28, | 1920 | 4,373.91 |
| 43 | Oct. | 19, | 1922 | 500.00 |
| 44 | Aug. | 28, | 1922 | 1,000.00 |
| 66 | Dec. | 16, | 1922 | 1,000.00 |
| 41 | Jan. | 17, | 1924 | 5,000.00 |
| 40 | Aug. | 10, | 1924 | 300.00 |
| 39 | Sept. | 4, | 1924 | 500.00 |
| 38 | Sept. | 11, | 1924 | 500.00 |
| 37 | Sept. | 16, | 1924 | 400.00 |
| 36 | Dec. | 6, | 1924 | 2,000.00 |

$27,489.36

Princeton Items

| | Count | From | | | Principal |
|---|---|---|---|---|---|
| | 6 | Jan. | 2, | 1913 | $1,916.01 |
| | 8 | Apr. | 1, | 1914 | 2,500.00 |
| (Sunds) | 26 | Sept. | 3, | 1920 | 1,000.00 |
| " | 29 | Sept. | 27, | 1920 | 500.00 |
| " | 31 | Oct. | 8, | 1920 | 750.00 |
| " | 34 | Oct. | 21, | 1920 | 423.06 |
| " | 32 | Oct. | 18, | 1920 | 1,000.00 |
| " | 57 | Feb. | 26, | 1921 | 1,900.71 |
| " | 56 | June | 7, | 1921 | 300.00 |
| " | 55 | Aug. | 15, | 1921 | 200.00 |
| " | 54 | Oct. | 3, | 1921 | 350.00 |
| " | 53 | Oct. | 7, | 1921 | 500.00 |
| " | 49 | Nov. | 12, | 1921 | 1,000.00 |
| " | 48 | June | 1, | 1922 | 600.00 |
| " | 47 | June | 24, | 1922 | 1,331.95 |
| " | 42 | Oct. | 19, | 1922 | 1,655.65 |
| " | A. | Apr. | 21, | 1920 | 1,077.58 |

$17,004.96

(Count A added by amendment to the petition.)

$44,494.32

On Counts 18, 67 and 68, for an amount equal to simple interest at six per cent per annum on $3,604.47 for 8½ months; on $2,000 for 11½ months; on $5,000 for 20½ months; on $4,000 for one month; on $3,000 for four months; the total of such interest being $860.67; also interest on said total sum at the rate of six per cent per annum from February 23, 1921, to date of new judgment.

On Counts 10 and 12:

On Count 10 for $1,500 with simple interest at six per cent per annum from October 28, 1915, to November 8, 1926.

On Count 12 for $803.66 with simple interest at six per cent per annum from July 22, 1916, to November 8, 1926. Give credit on November 18, 1926, for $2,303.66 and enter judgment for the balance with interest thereon at six per cent to date of new judgment.

Award judgment to plaintiff for costs. The new judgment shall draw interest at six per cent from date of its entry.

■ Execution on the whole judgment against the bonding companies shall be limited to the amount of the bond, to-wit, $250,000. The whole action of the plaintiff was conditioned upon his controverted claim that there had been no liquidation of the obligations of the guardian by any binding settlement in the probate court. He had no case except upon the penal obligation of the bond and in each cause of action he prayed for "judgment on said bond in the sum of $250,000.00" and no more. In a suit so framed and tried, he may not, under Missouri statutes and decisions, have recovery greater than the amount of the bond. Mo.R.S.1909, Sec. 1240, Mo.St.Ann. § 2883, p. 742; Garton v. Botts, 73 Mo. 274; Scruggs v. Scruggs, C.C., 105 F. 28; Hartford Fire Ins. v. Casey, 196 Mo.App. 291, 191 S.W. 1072, loc. cit. 1076. cf. Gary Realty Co. v. Swinney, 322 Mo. 450, 17 S.W.2d 505.